NEW YORK TELEPHONE CO. v. PRENDERGAST et al. (CITY OF NEW YORK, Intervener).

(District Court, S. D. New York. March 10, 1926.)

1. Constitutional law ⬯70(1).

Rate-making power is legislative and not judicial power.

2. Public service commissions ⬯21—Concern of courts in rate-fixing cases is simply to prevent confiscation.

The concern of courts in cases to determine reasonableness of rates fixed by Public Service Commission is simply to prevent confiscation and taking of private property for public use without just compensation.

3. Evidence ⬯83(1)—District Court cannot assume that Public Service Commission, about to fix rates after investigation, will establish confiscatory rates.

District Court cannot, in advance, assume that Public Service Commission, which has had subject under investigation for months and is about to fix rates, will establish confiscatory rates.

4. Evidence ⬯83(1).

Presumably public service commission will fix new rates according to principles prescribed in former suit.

In Equity. Suit by the New York Telephone Company against William A. Prendergast and others, constituting the Public Service Commission of New York, Carl Sherman, Attorney General of New York, and others, in which the City of New York intervened. On motion for an order amending and modifying the preliminary injunction heretofore granted. Motion denied.

John W. Davis, Edward L. Blackman, Charles T. Russell, and Frankland Briggs, all of New York City, for plaintiff.

Albert Ottinger, Atty. Gen., Frank J. Coleman, Jr. and Irwin Kurtz, Sp. Deputies Atty. Gen., and Charles G. Blakeslee, of Binghamton, N. Y., for defendants Prendergast and others.

George P. Nicholson, Corp. Counsel, of New York City (M. Maldwin Fertig, Joseph P. Morrissey, and Joseph F. Mulqueen, Jr., all of New York City, of counsel), for intervener defendant.

Before ROGERS and MANTON, Circuit Judges, and AUGUSTUS N. HAND, District Judge.

ROGERS, Circuit Judge. This court has been constituted, under the provisions of section 266 of the Judicial Code (Comp. St. § 1243), to hear and determine a motion of the plaintiff for an order amending and modifying the preliminary injunction order made in this court on August 15, 1924.

The original order now sought to be amended was made upon a motion for an injunction pendente lite, restraining defendants from compelling the observance of certain orders made by the Public Service Commission of the state of New York on January 25, 1923, prescribing the rates to be charged by plaintiff for telephone service furnished within the state. The ground of the motion made at that time was that the rates so prescribed did not afford the plaintiff a fair return upon the value of its property used in the regulated service.

The order, which the court made, restrained the defendants named therein, pending the trial and determination of the cause and until the further order of the court, from attempting to compel the plaintiff thereafter to observe or enforce the rates for telephone service in the city of New York prescribed by the order of the Public Service Commission made on January 25, 1923. It further provided as follows:

"* * * The plaintiff shall not during the time this order is in effect impose a surcharge greater than ten (10) per cent. upon the rates for its telephone service in the city of New York prescribed by the said order of the Public Service Commission, which is Exhibit E attached to and specifically referred to in the bill of complaint in this suit, and that no surcharge shall be imposed upon the rates specified in said order for service connection charges, restoral charges, toll service charges, or public telephone charges, and that no surcharge shall be imposed upon any of the rates prescribed by order of the Public Service Commission, applicable to telephone service rendered by plaintiff in any part of the state of New York outside of the city of New York; and

"Further ordered, that hereafter, and until the expiration of this order all bills sent by the plaintiff to its subscribers for telephone service, to which the rates prescribed by the said order of the said Public Service Commission, which is hereby enjoined, would otherwise apply, shall bear a statement or shall have inclosed therewith a printed card or paper setting forth a notice in substantially the following words:

"'Notice to Subscribers.

"'Keep the inclosed bill. If the suit of the company in the United States District Court for the Southern District of New York is dismissed, you may be entitled to a refund,

and the inclosed bill will be evidence of the amount for which you have been charged.'"

The order also provided:

"This order shall not take effect until the plaintiff shall file with the clerk of this court a good and sufficient bond with the American Telephone & Telegraph Company as surety, or with other good and sufficient surety, in the penal sum of five million dollars ($5,-000,000) conditioned upon the prompt payment to the defendants of all costs and damages which may be incurred or suffered by any party to this suit who may be found to have been wrongfully enjoined or restrained hereby, and further conditioned so that, in the event that a preliminary injunction as prayed for in the said bill of complaint shall not be awarded to the plaintiff upon or before the expiration of this order, the plaintiff shall refund to its several subscribers affected thereby, either in cash or by credit upon subsequent bills, any sums paid by them in the meantime in excess of the sums chargeable to them pursuant to the provisions of the said order of the Public Service Commission hereinbefore referred to, the enforcement of which is hereby temporarily enjoined. * * *"

It appeared at that time that the Public Service Commission, in fixing the rates and ascertaining the rate base, rejected the theory that the valuation of the plaintiff's property should be based on reproduction cost, and instead apparently acted upon the theory that it was to be determined on the book cost. This the court thought was erroneous, holding that reproduction costs, less depreciation, is the dominant element in rate-base ascertainment.

The court also held that the Public Service Commission in its attempt to determine a rate base had committed an error of law in deducting from the fair value of plaintiff's property its entire book reserve. In making that deduction the commission did not do so because it found that any such depreciation in fact had occurred; but it held that the plaintiff was estopped by its own figures of its book reserve. "This," this court said, "is merely untrue; the book charges represent what observation and experience suggested as likely to happen, with some margin over. The legal error is in not recognizing that the law requires deduction only for actual depreciation, just as actual as the present value, and the extent of that depreciation must be ascertained by the same kind of evidence. * * *" The court further held that the denial of any allowance for going value was also error of law.

The commission stated that the rates fixed by its orders were intended to yield a net return to plaintiff of only 7 per cent., and this court held this was error; it being customary to allow as a reasonable rate of return for regulated business like this one 8 per cent., unless a departure from that rate should be shown to be warranted. The opinion of the court may be found in 300 F. 822.

After the filing of the opinion an order was entered on September 2, 1924, appointing a special master to take testimony, fully find the facts, make all needed computations, and report his conclusions of fact and law to the court. The hearing before the special master began on October 14, 1924, and has not yet been concluded, but has proceeded almost continuously since that time.[1] It seems to be agreed by the parties on both sides that this hearing has been conducted with great diligence and that it cannot be concluded until some time in 1927. This is due to the character, extent, and complexity of the property of the plaintiff, and to the complex character of the questions involved, as well as to the fact that the defendants herein hold the plaintiff to strict legal proof on all points. The difficulty of the questions involved may in part be understood when it is said that the plaintiff contends that the reproduction cost new, less depreciation of its property in the state of New York, aggregates in excess of $500,000,000.[2]

---

[1] In an affidavit made on December 18, 1925, it is stated that "approximately 200 separate sessions or hearings have been held, and more than 200 witnesses have been examined. There have been taken to date more than 7,500 pages of testimony and more than 830 exhibits for the plaintiff have been either marked in evidence or marked for identification, such exhibits consisting of more than 20,000 pages."

[2] The affidavit of the plaintiff's valuation engineer indicates the complex character of the property involved. It is in part as follows: "The extent, distribution, and complexity of the physical property of the plaintiff in the state of New York are indicated by the fact that a detailed appraisal made by me as of July 1, 1924, the making of which occupied me and a large force of employees of the plaintiff working under my direct supervision for substantially more than a year, included more than 150 parcels of land, more than 150 buildings specially built for telephone uses and located on said land, more than 175 central offices and associated equipment installed in such buildings, and upwards of 228 other central office switchboards and associated equipment located in buildings rented, but not owned, by the company. Each of the larger central offices (to the number of more than 100) consists of from 500,000 to 1,000,000 separate items of apparatus of various kinds and classes. In addition there is attached to most of the central offices a separate

We are now asked to modify and amend the original order, so as to permit the plaintiff hereafter and during the time said order continues in effect to impose a surcharge greater than 10 per cent. upon the rates for its telephone service in the City of New York, upon which a surcharge of 10 per cent. is now permitted by the terms of said order, and also so as to permit the plaintiff to impose a surcharge upon the rates for like telephone service rendered by it in the part of the state of New York outside of the city of New York, and for such other and further relief as to the court may seem just and proper under the circumstances now existing.

The plaintiff now comes into court and asks that the court modify the injunction order made on August 15, 1924, which restricted the charges it could lawfully make to a surcharge of 10 per cent. on exchange rates in the city of New York, so as to permit an increase in the surcharge to 35 per cent. in the city of New York, and also a surcharge of 18 per cent. upon the rates for like service in the territory of the company in the state of New York outside of said city.

In October, 1920, the Public Service Commission commenced hearings upon the company's application for a substantial increase in the rates. In March, 1921, the commission granted what amounted to a 30 per cent. increase, by eliminating the 8 per cent. reduction then prevailing and by adding a surcharge of 20 per cent. Several months thereafter the commission reduced the surcharge from 20 per cent. to 10 per cent. thus making a net increase of approximately 20 per cent. over and above the rates prevailing prior to March, 1921.

Thereafter, on January 25, 1923, at the conclusion of the case before the Public Service Commission, the latter made an order, effective March 1, 1923, establishing a schedule of rates which yielded a further increase of approximately 5 per cent. This schedule was put into effect by the plaintiff, and no further proceedings had until early in 1924, when plaintiff filed a petition for additional increases, and in connection therewith asked for immediate temporary relief.

While this application was under consideration by the commission and proof was being taken, plaintiff applied to the federal court for an injunction restraining the enforcement of the rates then in effect, and asking for an increase of 14.6 per cent. The matter came before the statutory court, which on August 15, 1924, took the action already set forth, and which we are now asked to modify in the manner above stated.

It is to be remarked that proceedings are now, and for some time have been, pending before the Public Service Commission of the state of New York, which is making its own investigation with the view of fixing the rates to be charged by the telephone company, and it was represented at the argument before us that the hearing before the Public Service Commission is about completed. In view of the pending proceedings, not only before the master, but before the Public Service Commission, and in which the plaintiff is participating, and which are about to close, we are somewhat surprised that a proceeding of this nature should be brought into this court at this time, and that we should be asked in advance of the imminent action of the Public Service Commission, upon ex

---

power plant (one power plant sometimes serving two or more offices located in the same building). Each power plant consists of its own particular assembly of generators, motors, storage batterys, power switchboards, and other electrical equipment which are required to make up the complete power plant. In addition to the land, buildings, and central office equipments owned by the plaintiff in the state of New York, my appraisal also includes the classes of property of the plaintiff generally grouped and known in telephone parlance as 'Station Equipment and Outside Plant.' Included in this subdivision of the plaintiff's property, distributed throughout the state of New York, on July 1, 1924, were about 700,000 poles, supporting more than 215,000 miles of overhead wire and upwards of 22,500,000 feet of aerial cable. The poles, before they could be appropriately priced out by me, were first subdivided into the different kinds of materials and the different lengths and classes (circumferences at butt); the wire was first subdivided according to whether bare or insulated, whether of iron or copper, whether of one gauge (diameter) or another; and the aerial cable was subdivided according to the number and gauge of the wires contained within the cable sheath, etc. The underground plant consisted of more than 9,650,000 trench feet of underground conduit distributed throughout the state of New York, containing more than 47,000,000 duct feet and over 47,400,000 feet of underground cable. The underground cables differ as to the number and gauges of wire contained therein, and some are what are known to telephone engineers as 'straight' and some as 'composite' cables. There are 38 sizes of standard 'straight' cables, varying in the number of pairs of wires contained therein from 6 pairs to 1,212 pairs. The 'composite' cables are of great variety, there being in the plant of the plaintiff more than 275 classes of 'composite' cables, each varying more or less from the others in respect to the number, arrangement, and gauges of the wires contained therein. The station equipment included in my appraisal consisted of hundreds of thousands of items of plant; that is, the telephone instruments themselves, private branch exchange switchboards, booths, associated wiring, and miscellaneous equipment located upon the premises of subscribers."

parte and conflicting affidavits, where there has been no opportunity for the cross-examination of the parties, to make the order requested.

[1] Rate-making power is a legislative and not a judicial power. It is the duty of the Public Service Commission, acting as the duly authorized agent of the Legislature of the state of New York, to fix the rates of a public service corporation. It is about to exercise the powers with which it has been invested by legislative action, and just prior to its action this court is asked to enjoin the enforcement of certain rate-making orders of the commission which became effective March 1, 1923. In other words, we are asked to say that the rates which became effective on March 1, 1923, are void, on the ground that they are confiscatory, and to say it at a time when the Public Service Commission, which has been conducting an inquiry into the whole matter, is on the point of announcing its conclusion and fixing new rates.

[2] The concern of the courts in such cases is simply to prevent confiscation and the taking of private property for public use without just compensation. As the courts have said again and again, the making of rates is a legislative power. The courts can simply inquire whether the legislative power has fixed the rates so high as to deprive the public utility of its property, in violation of the constitutional guaranties. Pacific Gas Co. v. San Francisco, 44 S. Ct. 537, 265 U. S. 403, 415, 68 L. Ed. 1075; Bluefield Waterworks & Improvement Co. v. West Virginia Public Service Commission, 43 S. Ct. 675, 262 U. S. 679, 67 L. Ed. 1176; Lincoln Gas & Electric Co. v. Lincoln, 39 S. Ct. 454, 250 U. S. 256, 63 L. Ed. 968; Minnesota Rate Cases, 33 S. Ct. 729, 230 U. S. 352, 433, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18.

That this is a case of a most complex character must be evident from the length of time the special master has taken in his investigation of the matters referred to him at the former hearing, which already has occupied a year and almost five months, and which we are told will probably run through the remainder of this year. It is certain that it is impossible for this court to continue to sit, that it may itself examine the witnesses and reach a conclusion upon testimony taken in open court. This is made impossible in this district by the unescapable pressure of other and unavoidable judicial duties. It does not seem practicable at this time, and until the special master, heretofore appointed, has made his report, to undertake another and independent investigation, or even to enlarge the scope of the inquiry which he is now conducting under the prior order of the court.

[3] And for the court to undertake to dispose of the question presented upon the unsatisfactory evidence of the ex parte affidavits made by witnesses who have not been subjected to cross-examination seems to us at this time particularly ill advised. We cannot in advance assume that the Public Service Commission, which has had this subject under investigation for months, and is about to fix anew the rates to be charged, will establish confiscatory rates. To make any such assumption, in advance of its action about to be taken, would be to reflect upon that body in an unwarranted manner. For this court to act at this particular time would indicate that in our opinion the plaintiff is about to receive unfair treatment at the hands of the Public Service Commission. That commission, in fixing the new rates at the close of the investigation, in which it is now engaged, understands that its action will be subject to review by the courts, and that no rates which it fixes can stand, if in the opinion of the courts they violate the constitutional guaranties for the protection of property.

[4] We shall assume that the Public Service Commission, in fixing the new rates, will fix them according to the principles laid down by the court in the former suit. If it disregards those principles, which we will not anticipate its doing, it will be time enough then to bring the matter to the court's attention.

The application of the plaintiff at this time is denied.