## MONROE GASLIGHT & FUEL CO. v. MICHIGAN PUBLIC UTILITIES COMMISSION et al.

(District Court, E. D. Michigan, S. D. February 27, 1926.)

No. 540.

1. Gas ⬷⟹14(1).

Reproduction cost less depreciation may be dominant element in fixing rate base for gas company.

2. Gas ⬷⟹14(1)—Courts should consider rate established by commission as not intended to continue for more than three years.

In suit to test validity of rate for public utility, established and subject to change by Public Utilities Commission, courts should consider rate as if it were not to continue by its own force for more than three years.

3. Gas ⊚⇒14(1)—In determining reproduction cost of gas company plant for rate base, "going value" representing cost of development of business is properly considered.

In determining reproduction or replacement cost of a public utility as a gas company for rate base purposes, the "going value," representing cost of development or of having procured existing patronage, is a clear incident of value, without regard to whether it has been repaid out of earned profits, as may be material where historical or prudent investment value is involved.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Going Value.]

4. Gas ⊚⇒14(1)—Addition of 10 per cent. to skeleton value of gas company plant as representing "going value" for rate base held reasonable.

In determining reproduction cost of gas company plant for rate base purposes, an addition of 10 per cent. to the skeleton value of the plant for "going value" would seem reasonable.

5. Gas ⊚⇒14(1)—Reproduction cost of gas company plant as rate base should include suitable estimate for reasonably certain additions.

In determining reproduction cost of gas company plant as rate base, there should be added a suitable estimate for reasonably certain additions to the plant during a period of three years.

6. Gas ⊚⇒14(1)—Allowance of 7 cents per M feet of gas sold for annually accruing depreciation in determining operating expenses of gas company in rate case held appropriate.

Allowance of 7 cents per M feet of gas sold as an annually accruing depreciation charge in determining gas company operating expenses in rate base case held appropriate.

7. Gas ⊚⇒14(1).

Federal income tax held properly considered as operating expense of gas company in rate case.

8. Gas ⊚⇒14(1)—Good-faith disbursements by utility's management considered proper operating expenses in rate case.

Commission's power to regulate rates does not include power to manage a utility, and good-faith disbursements, such as for extending business and for legal services, by utility's management, not constituting an abuse of discretion, must stand as proper operating expenses in rate base case.

9. Gas ⊚⇒14(1)—7 per cent. rate of return to gas company held not confiscatory.

Rate of return for gas company somewhat less than 6 per cent. held confiscatory, and return of 7 per cent. not confiscatory.

10. Gas ⊚⇒14(1)—Gas company required, as condition to temporary injunction against enforcement of confiscatory rate, to agree to rebate excessive portion of rate collected.

Gas company was required, as condition to grant of temporary injunction against putting into effect of alleged confiscatory rate, to agree to rebate to its customers an amount equal to the excess over the rate held reasonable, which it had collected after date when reasonable rate might have been established had matter been brought promptly to decision.

In Equity. Suit by the Monroe Gaslight & Fuel Company against the Michigan Public Utilities Commission and others. On motion for interlocutory injunction. Motion granted, on condition.

See, also, 292 F. 139.

Beaumont, Smith & Harris, of Detroit, Mich., for plaintiff.

Andrew B. Dougherty, Atty. Gen., and Thomas J. Green, Asst. Atty. Gen., both of Lansing, Mich., for defendants.

Before DENISON, Circuit Judge, and TUTTLE and SIMONS, District Judges.

PER CURIAM. This cause is now before this court (sitting as a special tribunal under section 266 of the Judicial Code [Comp. St. § 1243]) for the second time. On the former hearing we granted an interlocutory injunction restraining, as confiscatory, the enforcement of a certain order of the defendant Michigan Public Utilities Commission, hereinafter called the commission, which prescribed certain gas rates (maximum net 1.55) to be charged by the plaintiff, Monroe Gaslight & Fuel Company, hereinafter called the utility. In our written opinion then filed (292 F. 139), we reviewed the history of the case, stated the salient facts, circumstances, and questions of fact and of law involved, and pointed out the correct rules and principles to be applied; and there is no need now to repeat what was there said in those respects. After the filing of this opinion the commission set aside its order thus enjoined, reopened the hearing before it, and took further proofs therein. It then (March, 1924) rendered another decision, and made an order thereon, making new findings and prescribing a new and different schedule of rates (maximum net 1.52) to be observed by the utility. Thereupon the latter filed its amended bill of complaint in this cause, attacking such rates as confiscatory, and seeking to restrain the enforcement of such order as a violation of the Fourteenth Amendment, and applied for a temporary restraining order, which was granted and is now in effect, and an interlocutory injunction pending the final hearing.

On the record at the former hearing, we expressed the opinion that the commission, which had fixed the value of the property of the utility, to be used as a rate base, at $275.-

000, was not justified in fixing a rate base of less than $375,000. We pointed out that there was no need at that time to decide whether the evidence required any greater valuation than the sum last mentioned, because, even according to the estimates and allowances of the commission respecting income and cost of operation, the rates then in question would not give the utility a fair return on that sum, and therefore such rates would be confiscatory.

[1] As we said in our previous opinion, we think that the Supreme Court has now adopted the rule that, at least in the absence of special circumstances controlling otherwise; and not present here, the dominant element in the fixing of a rate base in a case such as is now before us is the reproduction cost, less depreciation, of the property involved. This is not to doubt that there are many situations in which reproduction value would be a less controlling element; but this case, in our judgment, lacks the features which might have that minimizing effect. In the various discussions of the subject which we have seen,[1] the reproduction cost, as a criterion of present fair value, has been challenged chiefly upon two grounds:

The first is that the present and recent high prices of building, labor and material are abnormal, and that there must be an indefinite but large deduction on account of the coming fall in prices. When this theory was first advanced, it was very plausible, based as it was upon past experience. As the years have gone on since 1918, and the expected decline in prices has not materialized, its imminence has come to be less probable, and it is now, for the fairly immediate future, hardly more than a speculative expectation. It has too little substance and is too much shadow to justify the deference which it received in the theories of the economists a few years ago. In this connection it was likewise

---

[1] See Professor Goddard's "Fair Value of Public Utilities," Mich. Law Review, May and June, 1924. See, also, Judge Learned Hand's characterization of the composite fair value, in Michigan Law Review, vol. 24, p. 466, at page 473: "A third, and I think the most generally accepted, notion is that there is no rigid principle at all, but that, under the guise of some such soothing phrase as 'reasonable value,' all difficulties of theory shall be veiled, and embarrassing commitments avoided. Values shall in each case be determined at sums which will not too much outrage the susceptibilities of either side, by the comforting doctrine that all principles, however conflicting, shall have a just recognition. Not the first instance of man's escape from thorny questions of dialectics by a plea for the sacred spirit of tolerance, even the tolerance of contradictories."

thought that, in fixing a rate for a future period, the commission should look back over a long period of years for analogies, and not fasten upon the public for a long time a rate which may now be justified, but which later may be excessive. In this matter also perhaps unconscious deference has been given to practices now past and gone. If a franchise rate was to be fixed by contract for the formerly customary periods of 20 or 30 years, it was of course unsafe for the municipality, and, as the event shows, for both parties, to concede that the fair value would continue to be measured by existing standards. Hence it was clearly right to say that the current reproduction cost could not control, but was only one element in determining the present fair values. As the practice of making long-time contract rates has disappeared and has been superseded by indeterminate commission made rates, the contingency that the present values will be upset within that short future period in connection with which rates should be considered, has become less and less.

[2] It is our judgment that, under the known past and present and the reasonably expected future economic conditions, and when by statute or court order the commission retains jurisdiction to change rates from time to time, up or down, a court should consider a commission made rate as if it were not to continue by its own force for more than 3 years. The Court of Appeals of this circuit said (City of Louisville et al. v. Louisville Home Telephone Co., 279 F. 949, 959) that it is not feasible to have rates continually changing, and it suggested the period of 3 years as under ordinary circumstances a minimum that might be deemed fairly in contemplation when the rate was made. There is therefore, in any such review as we now have before us, no occasion for trying to anticipate the future for more than 3 years; and there is neither any general view of which we can take judicial notice, nor any testimony in this case, of substantial probability that the average of the reproduction costs for the next 3 years will be any less than it is now.

The other ground for declining to give full force to reproduction value is the contingency that from competition or municipal disaster, or other cause, the business field has proved or will prove unsatisfactory and the business continue or become so unprosperous that the value of the plant will be less than reproduction cost, since it will neither make profits nor be salable. Here again, if we confine our speculations to a short future

period, there is nothing substantial. The city of Monroe is growing and prosperous, the plaintiff's business is constantly increasing, and there is no reason to anticipate business trouble. Not long ago it was feared that the business of making and selling artificial gas was nearly at an end, as it would soon be supplanted by electricity. This fear was not realized. Property should not be deprived of a minimum reasonable return by the mere possibility that it may eventually be destroyed in some other way.

Applying to this case, on the record as formerly presented, what we thought the proper rules, we noted that the commission's own engineers and accountants had found that the reproduction cost of the physical property, less depreciation of about 10 per cent. of such cost, was $401,000, that the commission had also stated that, in fixing the rate base, it would include the allowance of "something like $25,000" for working capital and also "a proper allowance" (the amount of which it did not state) for "going concern value," and that, notwithstanding all of this, it had announced the general verdict that the then present fair value of the entire property, to be used as a rate base, was $275,000. We then thought these figures very persuasive to the effect that the commission practically fixed the historical cost or prudent investment cost as the rate base, and erroneously gave no substantial effect to the reproduction cost. On the record now before us, we see no reason to modify our opinion in those respects, as applied to the present value fixed by the commission as the rate base, namely, $350,000. It is true that the commission's engineers have revised and reduced the estimated cost of reproduction of the physical property, less depreciation, from their former figure, to $337,536.15 as of January 1, 1923. The propriety of this reduction is disputed by the utility. It is based on the commission's inventory as of February 15, 1922, and does not include additions to the property since the last-mentioned date. To this physical property item must be added a suitable allowance for working capital. The commission has allowed $25,000 for that item. We stated in our previous opinion that the evidence indicated $30,000 to be a proper minimum sum, and we see no reason now to doubt the correctness of that conclusion.[2] It is

clear from the record that additions and betterments were made to the property between February 15, 1922, and the time of the hearing before us in May, 1924, the last-amended bill of complaint having been filed April 3, 1924, which represent an addition to the value of such property, as compared with the figures based on the 1922 inventory just referred to, amounting to $19,407.32, less depreciation. There was also uncontradicted evidence on the hearing before us to the effect that the cost of material and labor entering into the property in question had then increased by 8 per cent. since the time of the making of said inventory, which, applied to the reproduction appraisal of $337,536.15 referred to, excepting the land, would add about $26,000 to this sum.

[3] Now making a disproportionately large allowance for depreciation in the new property, these figures will give us a total of (more than) $410,000, as a reproduction value, with working capital, but without customers. There remains the subject of the cost of converting the basic structure into a going business. There is much confusion as to the name by which this should be called. For the purpose of this opinion we will call it "going value." For this going value, the utility claims an additional sum of $65,000; while the commission, according to its computation, allowed a little less than $6,000. The plaintiff's expert evidence that there is a "going concern" value of $65,000 is based in inseparable part upon the "intangibles," like favorable contracts, strategic situation, and community good will. These lead into debatable ground, where we have as yet no clear teaching from the Supreme Court, and we leave these things out of present consideration; but, so far as the conclusion of value depends on development costs, by which we mean the cost of getting customers, the case is different. Such investment is essential to put value into the plant. The early part is closely akin to interest during construction, and it would be prudent to have initial capital sufficient to use some of it for this development purpose. Whenever and to the extent that historical cost or prudent investment is to be determined, it is material to know whether this development cost has been repaid out of later profits; not so when we use reproduction value as the starting point. It is too plain for doubt that the fair present value of a plant with an established output of 80,000,000 feet is greater than that of an equivalent plant with no business. The additional value is there. Nor is it important that, if perhaps the busi-

---

2 With the actual cash the utility thinks necessary, and with the average accounts receivable currently necessary to carry, the amount would be $40,000. The commission cuts down the cash, and for the accounts receivable substitutes 60 days' pay roll.

ness has been developed to the point of "saturation" by an existing company, the hypothetical new plant would probably get the old customers with little expense. We are ultimately fixing the value of the old plant, not of the new one; we take the latter only as evidence, as far as it goes, of the former.

If we suppose (arbitrarily) that an annual consumption of 30,000,000 was necessary to put this plant into the successfully established class and, again arbitrarily, that it cost $500 per million to get this business, we have an added $15,000 value plainly present in the plant, for which initial capital might wisely have been used, in order that dividends might not be delayed or diminished. Whether the utility actually made this back in current profits, or lost money every year, would be of no importance. In that franchise contract period annual losses were of course no criterion of development costs. The loss may have come because there was too little development expense, or too much, or there may be no relation between them. Annual profits belonged to the utility, to be withdrawn or to remain invested. The same principles apply with little, if any, less force to the cost of attaching the next 50,000,000, which might be, again arbitrarily estimated, $250 per million. We consider such costs as a clear incident of value pertinent to the replacement cost theory of fixing the rate base. Without that, the replacement is not complete.

We venture to think that much confusion as to the status of "going value" has arisen through failure to distinguish the characteristics of the preregulatory period. Of course, the moment a commission has fixed the annual cost of getting business, and allowed it as an operating expense, and thereby pro tanto increased the per M rate to which the company would otherwise have been restricted, that moment this cost, to that extent, ceases to be capitalizable or to have any effect on the rate base. Not so in the earlier period, when there was a franchise contract rate, express or implied. There never was any obligation, without contract or statute, on a public utility of this kind, to render service for a rate just barely above the confiscation line. In its discretion the Legislature might so order; but otherwise the courts would not compel it. The limit of the common-law power, if there is such power, would be to prevent an extortionate charge. Between that unreasonably low rate which a statute may not compel, and the unreasonably high one which perhaps the

common law would not permit, there is a wide margin of fair rates, and in the preregulatory period this margin belonged by contract to the utility, to use for dividends or to retain added to the investment for improvements and development, as it pleased; in either case it was increasing fair value, as affecting a future rate base. If the service given, plus a fair return, was worth more than the contract rate, the public gained, and the utility was remediless; if less, the entire gain, whether much or little, belonged to the utility.

The same reasons apply to the regulatory period as to development costs paid out of the allowed return, instead of using it for dividends or tangible new assets.

[4] For the reasons stated, we must reject the estimate of $65,000. Reported decisions show estimates as high as 25 per cent. or 30 per cent. of the cost of tangibles. These may be extravagant. Seemingly there is no definite percentage relation. At the same time the proposition that a plant of this kind, and in this business, and in successful operation, with customers somewhat permanently attached for its capacity output, is worth 10 per cent. more than the skeleton would cost, seems not unreasonable—no circumstances contra appearing.

[5] Further it is obvious that in making a rate for a contemplated period of, say, 3 years, there should be added to the rate base a suitable estimate for the reasonably certain additions to the plant during the period, and which cannot be made without new capital or an equivalent retention of dividends.

Considering all these elements, and rejecting all the forceful claims presented by the utility, that the replacement value should be much higher than the amount fixed by the commission's engineers, and that the working capital is more and the going value is much more than the sums we have indicated, we feel that we sufficiently discount the replacement value and the going value when we state the sum of $425,000 as the rate base which the proof in this record fairly establishes and which cannot lawfully be impaired. We do not overlook that the amended bill alleges a fair value of "$400,000 and upwards." Under some circumstances it would be right to hold plaintiff to that definite figure as a maximum; but to do so now would only lead to a request for amendment which we should grant. We should grant it because, upon plaintiff's theories, more than $400,000 was immaterial, and hence sufficiently alleged by "upwards." Plaintiff alleged the right to a rate of return higher, and claimed the fact

of an actual return lower, than we find it necessary to consider or to assume. We therefore make the exact rate base more important than it was under plaintiff's theories, and we should be fairly liberal in construing "and upwards."

With the delays of counsel in getting the motion finally submitted by the last reply brief, and with an ensuing delay by the court in assembling and formulating its opinion, the year 1924 passed without decision announced. Since the members of the court had then informally reached a tentative conclusion that the preliminary injunction must issue, it seemed best to have before us the actual results of the year 1924, rather than to base the opinion upon the estimates and forecasts made early in the year. Accordingly, at our request, these results were furnished, have been received into the record as if formally proved, and counsel for both sides have commented in further briefs. If it be said that our judgment should be based on the proofs existing when the commission acted, it may be replied that we interpret the conflicting estimates and forecasts of that time as establishing the then reasonable probability of those events which later did take place. These records show that the actual net receipts of the utility for the calendar year 1924, if computed according to the commission-made rate of March, 1924, and if otherwise ascertained as the utility kept its books, would have been $22,799. The only remaining question, therefore, is whether the expenses of operation, as shown by the utility's books, should be so revised as to raise the net income.

The most substantial item in controversy is the allowance for the annually accruing depreciation, or, as it is called upon the utility's books, "Retirement Expense." Each party has adopted, as a convenient though arbitrary measure, a rate per M feet of gas sold. The utility charges up 10 cents; the commission allows 7 cents. For the actual operation of 1924 this makes a difference of $2,196.

[6] We think the action of the commission in this respect should stand. The item is not one of expense actually incurred in pursuance of the discretion of the utility managers; nor does it specifically depend upon expert knowledge of what is happening from year to year in this particular plant. From any viewpoint it is only a bookkeeping estimate. It is to provide, not an actual fund, but a ledger account, against which can be charged those replacements which occasionally must be made, and which cannot be treated as that regular maintenance which constitutes a part of annual operating expense. A considerable portion of the disbursements of this character may be charged against one or the other account, according to the discretion of the bookkeeper. Fixing the rate at 7 cents, the commission has in a measure committed itself to its future approval of such treatment of the maintenance account as will, so far as possible, prevent undue exhaustion of this depreciation account. Under the old practice, where there was a long-time contract rate, the utility carried a certain duty to its stockholders to provide, by a liberal depreciation account, means for meeting unexpected injuries or losses in the value of the plant, without impairing the capital account. Under the present system, if such unavoidable losses occur beyond the capacity of the permitted depreciation account to carry them, good faith on the part of the commission will require a special allowance in the rate to provide for amortization; and the record of this commission gives every reason to suppose that such obligation will be observed. This relying to this extent upon the future action of the commission is not inconsistent with our refusal to do so to the extent noted in our previous opinion, because there we were speaking of an otherwise certain confiscation; here we are thinking of a merely possible future development.

Further, the commission is charged with general duties upon this subject throughout the state. In a matter so arbitrary as this depreciation allowance, it is not inappropriate that the commission should establish some measure of proportionate uniformity in bookkeeping methods to be generally adopted, and its effort to do so should be approved, if possible.

It is true that even the higher depreciation rate set up by the utility seems low when stated in terms of percentage upon the present fair value of the depreciable property. It is, as near as may be estimated, a trifle over 2 per cent., while the rate set up by the commission is a little less than 2 per cent. However, as already stated, this percentage rate must depend upon the extent to which maintenance is allowed out of the annual operating expenses; and, considering the history of this plant and all the circumstances, we conclude that the commission rate, 7 cents, is appropriate.

[7] The next item of attack is the federal income tax which the utility has deducted as an operating expense; the amount being $1,-679. This should clearly be allowed as an operating expense (Galveston Co. v. Galves-

ton, 42 S. Ct. 351, 258 U. S. 388, 399, 66 L. Ed. 678), but has its due effect in fixing the proper rate of return.[3]

[8] The two remaining substantial items of criticism can be considered together. The utility estimated in advance an allowance of $3,300 for getting new business. The commission estimated $1,800. The amount actually expended was $3,050, being $1,250 more than the commission thought proper. All now agree that the event justified the expenditure. For the items of legal and other expenses before and in connection with the commission, the utility's appropriation was $1,800; the commission allowance was $1,000; the amount actually charged up as expended as an operating expense was $1,800. These two items make a difference of about $2,000. At to them, we see no reason why the discretion of the utility managers should have been revised. It is to be remembered, as has often been said, that the commission is to regulate rates but not to manage the business. The extent to which the utility managers should advertise and make efforts to get new business, or keep what they have, and the extent to which they should go in defending what are claimed to be their stockholders' rights, are matters peculiarly of business management. If the failure to earn the minimum return under the prescribed rate is due in controlling part to grossly inefficient management, a suit like this must fail; but the constitutional guaranty is not to be avoided merely because the management is less than perfect. As to all disbursements actually made within the limits of good faith, the managers' discretion must stand, unless it is abused. Particularly as to the cost of contest before the commission and the courts, it goes without saying that power by the commission to prevent the expenditure of reasonably necessary amounts cannot be assumed. The amounts here involved on both items are relatively trifling, and did not justify cutting down in advance. If the total amount in such matters were agreed upon and the question were only whether it should be amortized over 5 years, or over 10, perhaps the commission's judgment should prevail, for the same reasons stated as to annual depreciation; but such a situation is not here shown.

[9] From this review, it follows that the total annual net return for the year 1924 was substantially $25,000, being less than 6 per cent. Under these circumstances we do not attempt to determine what the constitutionally minimum rate would be. Some-

what less than 6 per cent. is doubtless confiscatory, even making some allowance in connection with the corporate income tax. It is, however, due to the parties who have fully argued the matter, and to making an end of litigation, that we should express our opinion as between plaintiff's claim of 8 per cent. and the commission's expressed intention to allow 7 per cent. With the rate base increased to the amount which we have specified, with the liberal return the utility has received from February, 1922, to March, 1924, with its now established prosperity and credit, with the fair treatment as to its disbursements which it has received from the commission, and which in other respects we are prescribing, and particularly with the declared willingness of the commission to allow a return of 8 per cent. as this may be brought about by an increased volume of business and by more efficiency, we conclude that, under all the circumstances disclosed by the record, including the payment of the corporate federal income tax, a 7 per cent. return would not be confiscatory. This conclusion is of course based only on the record now existing.

Again, as upon the former hearing, we are asked to penalize the utility because, during this litigation and by virtue of the old rate, it has been making large profits. We covered this subject in our former opinion. We do not now find facts which justify imposing such a condition upon the injunction. [10] There is no principle which makes it inequitable or extortionate for the utility to earn more than that minimum which the Constitution protects. We are not prepared to say that receipt of even 10 per cent. upon the right rate base, for the period of a year or two and while litigation is pending, and under a situation which is primarily caused by the commission's attempt to enforce a confiscatory rate, should be considered such extortion or unfair advantage by the utility as to require, as a general rule, that some of this 2 or 3 per cent. should be surrendered, before a court of equity will award the relief by injunction to which the utility is otherwise entitled.

However, the situation in this case is peculiar. As we compute it, and if the views we have expressed are right and had been recognized, it may be assumed that the commission in March, 1924, intending to allow 7 per cent., would have made a rate of about $1.60 net, first 10 M, with an actual average of about $1.58. If this motion had been promptly heard and decided, it may be assumed that such a rate would have been

---

[3] See note at end of opinion.

made by July 1, 1924, and would have been valid. Part of the delay since that time is chargeable to both parties, in their efforts to get further consideration by the court, and the remainder has been delay on the part of the court, due to what seemed to be pressure of business. Under these conditions it seems inequitable to penalize the public and let the plaintiff profit from the delay since July 1, 1924, and we think that, as an equitable condition of obtaining the temporary injunction, the plaintiff should voluntarily agree to rebate to its customers the excess collected since that date, above the average rate of $1.58. The plaintiff, before taking an injunction, can submit a satisfactory showing that it has made this rebate, or that it has adopted some suitable plan, approved by the commission, for distributing the rebate over a future brief period.

Since the provision just mentioned for rebate, does not affect the liability of the sureties upon the bond which was given with the restraining order, and since this suggested rate of $1.58 is not one to be made by the commission upon future testimony of conditions prevailing at a future time, we deem our suggested action not inconsistent with the holding of the Supreme Court in the Newton Case, 42 S. Ct. 264, 258 U. S. 165, 176–178, 66 L. Ed. 538.

The entry of an order in accordance with this opinion will naturally be suspended until plaintiff elects whether to accept the condition. If accepted, the order can then be drawn. If not accepted within 30 days, the commission can bring the matter to our attention for appropriate action.

If the parties wish to hasten the cause to a final decree, we would approve a stipulation for final submission upon the present record, or they may otherwise speed the cause as they may be advised.

A bond will be required as before, as a condition of the injunction now ordered; the conditions of such bond are to be the same as those of the bond required by the terms of our previous opinion herein.

Note and Comments of Circuit Judge DEN-ISON Regarding the Corporate Income Tax.

In connection with the rate of return, a court must come to the matter of the payment of the corporate federal income tax, one incident of which the Supreme Court has said is "a part of the return." So it is, in a certain sense, but not in every sense. In the Galveston Case, 41 S. Ct. 351, 258 U. S. 388, 399, 66 L. Ed. 678, wherein the effect of the corporate income tax was so characterized, the extent to which this payment did become a part of the return was not discussed, nor does the subject seem to have been of vital importance to the decision.

An inferior court may therefore feel at liberty to consider this matter of extent, and to observe whether there is basis for the assumption sometimes made that the whole tax is of that character. It seems to me clear that the ordinary and usual effect of this payment, as indirectly equivalent to a part of the return, is of such small, if not negligible, degree that it cannot cut much figure.

I do not see that this corporation income tax can be thought of as a part of the return to the corporation. It is an outgo, and it does not take the place of any income tax from which the corporation is excused. The rate of income tax which the corporation should pay was considered by Congress, and was fixed, and I see no basis for supposing that the tax would have been fixed at a larger amount if some other theory had been adopted. The income is an existing thing which is ascertained, and the tax is imposed upon it, and that is the end of the matter. The underlying theory of the proposition that the corporate tax affects the net return has reference to the return received by the stockholders, and is that the payment of their income tax by the stockholders is a burden of which they should not be relieved in any indirect way, and that the allowance of this corporate tax as a disbursement, before fixing the net return to which the stockholders are entitled, is an indirect exoneration of the stockholders from this unescapable personal burden. I cannot find in the facts of what I think the typical case any very extensive basis for this inference. In truth, no such indirect exoneration takes place, save in a minor degree. This being the general truth, it follows that, if there are peculiar facts showing that in the particular case there is a substantial degree of such exoneration, these facts should be shown by those who deny the more common situation.

Consideration of a concrete example supports this conclusion. Consider that the Revenue Act of 1925 applies (that of 1921 [42 Stat. 227] would not bring very different results), and assume that the utility had such a net income for the year as to require the payment of a corporate tax of $3,000—then to what extent are the stockholders exonerated from their personal income taxes, payable upon their dividend income, by the fact of this corporate payment? In other words, how would their income tax paying status have been changed if this corporate tax had not been payable?

Obviously, the income tax paying stockholders save nothing, unless the $3,000 would otherwise have been paid out in cash dividends. So long as this sum were to be retained in surplus or undivided profits as against expansion, and even if later divided as a stock dividend, the stockholders would not be taxable thereon, and so could save nothing from their own taxes by this corporate payment. If, however, the $3,000 were to be disbursed as cash dividends, a stockholder holding one-tenth of the stock would be taxable on his dividend thus: (a) If his income, if he was head of a family, was less than $2,500, nothing; (b) if this $300 receipt were bracketed with the first $4,000 of taxable income, his tax would be $6; (c) if bracketed with the next $4,000, the tax would be $12; (d) if with the next $2,000, it would be $18; (e) if above $10,000, the corporate payment would have no effect. In shorter phrase, the corporation's payment of its income tax per-

mits the stockholders (sometimes) to deduct the same amount, not from their income tax, but from their taxable income.

What the concrete result of this figuring would be, in the ordinary public utility corporation, no one knows. Certainly the stockholder's tax, from which he might be thus excused, could not exceed 6 per cent. of his dividend, and hence 6 per cent. of the corporate tax paid is the extreme to which there is basis for considering this corporate tax as a part of the stockholder's return; and the average will be less. In the present case it could not be over $100. It follows that the federal income tax paid by the corporation does not justify approving a dividend (earned) rate of substantially less than would otherwise be compensatory.