## MICHIGAN BELL TELEPHONE CO. v. ODELL et al.

### No. 1322.

District Court, E. D. Michigan, S. D.
Nov. 25, 1930.

Stevenson, Butzel, Eaman & Long, of Detroit, Mich. (Thomas G. Long, of Detroit, Mich., of counsel), for plaintiff.

Wilber M. Brucker, Atty. Gen. of State of Michigan, and Harold Goodman, Sp. Asst. Atty. Gen., for defendants.

Clarence E. Wilcox, Corp. Counsel, and David H. Crowley, Sp. Counsel, both of Detroit, Mich., for intervener City of Detroit.

Ganson Taggart, City Atty., of Grand Rapids, Mich., for intervener City of Grand Rapids.

Before TUTTLE, SIMONS, and MOINET, District Judges.

PER CURIAM.

The plaintiff is a Michigan corporation owning and operating a public utility in the state; the defendants are the members of the Michigan Public Utilities Commission and the Attorney General. The intervenors are the cities of Detroit and Grand Rapids and a number of other cities of the state, which, in the absence of objections, were permitted to intervene. The bill is filed to declare null and void certain specified orders of the defendant commission prescribing maximum telephone rates to be charged by the plaintiff in its various exchanges in the state, such rates being alleged to result in confiscation of the plaintiff's property and in violation of its rights under the Fourteenth Amendment to the Constitution of the United States. The bill prays for a permanent, but not for a temporary, injunction. Subsequent to the filing of the original bill, the plaintiff filed a supplemental bill reciting further orders of the commission in respect to rates, and asking for the same relief from such orders as had been prayed for in the original bill.

No temporary injunction having been sought, an order was entered by one of the District Judges referring the cause to a special master with instructions to hear proofs and to make findings of fact and law upon the respective issues involved, and to report his findings to the court. Upon the filing of the master's original report and a supplemental report following a re-reference, exceptions were filed on behalf of the several defendants and a waiver of exceptions on behalf of the plaintiff.

No temporary injunction having been sought, and there being under such circumstances no legal requirement for the convening of a statutory court under section 266 of the Judicial Code (28 USCA § 380), no such court was convened, but, the cause being of major importance, and counsel for all parties giving approval thereto, the hearing upon exceptions to the master's report was had before the three judges of the district, all three collaborating in a study of the case, and all joining in this opinion.

An early contention of the defendants was that the plaintiff was not entitled to file its bill because it had not sufficiently complied with the legal requirement that it should make reasonable efforts to exhaust its remedy before the commission before resorting to this court. The conclusion of the master upon the facts and the law that the plaintiff is properly before the court not being challenged by any exceptions on the part of any of the defendants, the report of the master is in this respect confirmed.

The separable contention of the city of Detroit that, in determining the reasonableness of the telephone rates in effect in the Detroit exchange, the property, reve-

nues, and expenses of the plaintiff involved in the furnishing of telephone service in that city should be segregated from those involved in connection with the other exchanges in the state, and that, if that be done, the present rates prescribed by the commission for the Detroit exchange are sufficient to afford a fair return upon the fair value of the plaintiff's property devoted to the furnishing of service in such city, was held by the master to be contrary to established law on this subject, for the reason that, in determining whether rates prescribed by a state for a public utility are confiscatory, the property, revenues, and expenses of such utility ought to be considered on a state-wide basis. With this conclusion we agree, and the master is in this respect confirmed upon the authority of St. Louis & San Francisco Railway Company v. Gill, 156 U. S. 659, 667, 15 S. Ct. 484, 491, 39 L. Ed. 567, 673; Puget Sound Traction Light & Power Company v. Reynolds, 244 U. S. 574, 37 S. Ct. 705, 61 L. Ed. 1325; New York Telephone Company v. Prendergast (D. C.) 36 F.(2d) 54; United Gas Company v. Kentucky Railroad Commission, 278 U. S. 300, 49 S. Ct. 150, 73 L. Ed. 390.

The relations between the plaintiff and the American Telephone & Telegraph Company, particularly the so-called license contract under which the plaintiff paid originally 4½ per cent. and now pays 1½ per cent. of its gross revenues in consideration of various engineering, accounting, and financial assistance given to it by the other contracting party, was the subject of much dispute before the master, as indeed it has been elsewhere in rate cases involving telephone companies, and as it has been between the present litigants before the courts of Michigan. It is clear that as a matter of law the master was right in holding untenable the contention that the plaintiff may not here seek relief because it is not the real party in interest; such contention being made in reliance on the Michigan statute (Comp. Laws 1915, § 12353) providing that "every action shall be prosecuted in the name of the real party in interest." We agree with the master that it is fundamental that a state statute restricting the right to maintain suits in its courts is not applicable to or binding upon a federal equity court, and that no state procedure can affect a substantive federal right. Pacific Telephone & Telegraph Company v. Kuykendall, 265 U. S. 196, 44 S. Ct. 553,

68 L. Ed. 975; Central Vermont Railway Company v. White, 238 U. S. 507, 35 S. Ct. 865, 59 L. Ed. 1433, Ann. Cas. 1916B, 252. The legal effect of the contract between the American Telephone & Telegraph Company and its subsidiaries has already been litigated and adjudicated in the United States Supreme Court adversely to contentions similar to that made by the defendants here. Houston v. Southwestern Bell Telephone Company, 259 U. S. 318, 42 S. Ct. 486, 66 L. Ed. 961; Southwestern Bell Telephone Company v. Missouri, 262 U. S. 276, 43 S. Ct. 544, 67 L. Ed. 981, 31 A. L. R. 807. The Michigan Supreme Court has likewise sustained this contract in City of Detroit v. Michigan Railroad Commission, 209 Mich. 395, 177 N. W. 306; Michigan Public Utilities Commission v. Michigan State Telephone Company, 228 Mich. 658, 200 N. W. 749. Reliance is now placed by the defendants upon the decision of the Michigan Supreme Court in a quo warranto proceeding. People v. Michigan Bell Telephone Company, 246 Mich. 198, 224 N. W. 438, decided in 1929 during the pendency of this suit, in an endeavor to secure the elimination from consideration of the contract percentage as an element of the company's expense of doing business. The master concluded that the opinions of the United States Supreme Court in the cases cited are, until modified by that court, binding upon us, and in this conclusion we agree. In any event, the judgment of ouster by the Michigan Supreme Court in the quo warranto proceeding was predicated upon the company's failure to include in its computation of rate the reasonable value of the services rendered and the facilities furnished by the American Telephone & Telegraph Company. The master found that the reasonable value of the services and facilities furnished is not exceeded by the amount provided by the instrument. This amount is now substantially less than it was at the time of the commencement of this suit, and we see nothing in the record warranting the sustaining of the exception to the master's finding in this respect. We take the same view as the master that the profits of the Western Electric Company, another subsidiary of the American Telephone & Telegraph Company, are not to be considered as affecting the true cost of equipment and supplies purchased by the plaintiff.

The master found on all the relevant facts and circumstances, as disclosed by the record, that, in order to avoid confisca-

tion, the plaintiff was entitled to an annual return of 7 per cent. upon the fair value of the property of the plaintiff in Michigan used and useful in the rendition by it of telephone service within the state, and that any return less than that rate is so unreasonably low as to be confiscatory and invalid. The defendant commission, by its opinion of January 6, 1926, allowed the plaintiff a similar return, although it is now suggested by counsel that less than that would not be unreasonable. We do not suggest that the defendant commission is precluded by such order from now urging a lower rate of return, if the relevant facts as disclosed by the present record would indicate the fairness of some lower rate, giving full consideration, however, to the commission's judgment of the fairness of a 7 per cent. return as of the date of the order. This court in Monroe Gaslight & Fuel Company v. Michigan Public Utilities Commission, 11 F.(2d) 319 (two of the present judges sitting), held that such rate would permit the utility a reasonable return. It was there also a rate approved by the commission. A similar rate was approved as a fair return upon property of like nature in 1929 in New York Telephone Company v. Prendergast, supra, and by the United States Supreme Court in Pacific Gas & Electric Company v. San Francisco, 265 U. S. 403, 44 S. Ct. 537, 68 L. Ed. 1075. Rates of 7½ per cent., or even 8 per cent., have been considered necessary to avoid confiscation in other controversies, but not upon the same type of utility. United Railways & Electric Company of Baltimore v. West, 280 U. S. 234, 50 S. Ct. 123, 74 L. Ed. 390; Consolidated Gas Company of New York v. Prendergast (D. C.) 6 F.(2d) 243. We confirm the master's finding that 7 per cent. is a rate of return that will avoid confiscation.

The principal attack made by the defendants upon the master's findings in the exceptions filed, the oral arguments at the hearing, and the very able and exhaustive briefs, relates to the subject of depreciation. This has two aspects, both in issue: (1) The amount of depreciation which to date has accrued in the property, and (2) the depreciation reserve. It cannot be disputed, and it is not here disputed, that for the purpose of ascertaining the proper rate base, in so far as reproduction cost new is an element in the ascertainment of fair value, such reproduction cost must be diminished by the amount of depreciation ac-

tually existing in used property. The conflict here is as to the proper method of determining the amount of actual depreciation to be deducted. Defendants here contend for a depreciation method that is based entirely upon loss of service life of plant elements, regardless of their actual condition. The plaintiff contends that the only proper way to arrive at a conclusion as to how much should be deducted from value new to represent accrued depreciation is to examine the property on the ground and see how much it has actually depreciated. There is authority upon which the defendants may base their position. Idaho Power Company v. Thompson, 19 F. (2d) 547; Chesapeake & Potomac Telephone Company v. Whitman, 3 F.(2d) 938; New York Telephone Company v. Prendergast, supra. These are District Court cases. The Supreme Court of the United States has, however, established the rule that facts shown by reliable evidence are preferable to averages based upon assumed probabilities, and that the testimony of competent valuation engineers who have examined the property is to be preferred to mere calculation. Pacific Gas & Electric Co. v. San Francisco, 265 U. S. 403, 44 S. Ct. 537, 68 L. Ed. 1075; McCardle v. Indianapolis Water Company, 272 U. S. 400, 47 S. Ct. 144, 71 L. Ed. 316. The master applied the rule deemed by him to be settled by the Supreme Court to the evidence in the present case, giving to the testimony based upon actual inspection the superior probative weight to which it is entitled as compared with testimony based upon theoretical calculation. In doing so, however, he considered such evidence in the light of the entire record, and found the condition or present fair value of the physical elements of the plant to be 89 per cent. of the cost of reproduction as against the claim of the company that the depreciation estimated upon actual inspection did not exceed 8⁵⁄₁₀ per cent. of the reproduction cost. We think the master in applying the rule that must be controlling upon us made a proper finding as to accrued depreciation.

Upon the subject of depreciation, both accrued depreciation and depreciation reserve, or depreciation expense, defendants' counsel has lavished a wealth of argument, illustration, and reference. It is undoubtedly to him the crux of the case. In determining what amount shall be set up annually as a depreciation reserve to replace

property used up in operation, the company uses the so-called "Straight Line Method." This method provides for an equal and constant annual charge, representing depreciation or loss of property consumed in operation, to operating expenses, which in the aggregate is equivalent to the service value of the property, or to so much of that value as has expired when the property is retired. This method of estimating depreciation is vigorously attacked as inaccurate and as unfair to the public. Counsel urges very strongly the application of a method involving sinking fund principles. The particular method urged for application here is referred to as the equal annual payment method. Under it interest calculations are used for the purpose of ascertaining the present worth of the value of capital which it is assumed will be consumed during the specific periods of the probable life expectancy of plant units. As we understand it, the current depreciation which is to be charged to depreciation expense is the currently disappearing present worth of future losses of value resulting from the running out of the estimated life of property in service. The result of such calculation is that the greater the service life remaining in property at the time of valuation, and the more distant its ultimate retiral, the less will be the present worth of periodic future losses of value, and, the nearer property approaches the estimated end of its service life, the greater will be the then present worth of expected used up value. Since a growing telephone property is always compositely in its earlier years of service life, the current charge to depreciation reserve must always be substantially less under this method than under the "Straight Line Method" by which depreciation is distributed in equal annual charges over the entire service life of the property. In so far as time would permit, we have made a very careful study of the defendants' proposed method. Admittedly the so-called sinking fund method is not new. It originates in a report of the committee on valuation of the American Society of Civil Engineers submitted to the society in 1914, and approved as correct in a final report of a special committee to formulate principles and methods for the valuation of railroad property and other public utilities published in 1917, volume 71, at page 1311, of the transactions of the American Society of Civil Engineers. The development of the specific method here

contended for and its presentation has been progressive, not only during the last three years of the history of this litigation before the master, but between the time of the master's report and the hearing on exceptions before the court. We should like to give further study to it if it were possible to do so without abandoning all other litigation now before the court. Its soundness is attacked with apparent plausibility by plaintiff's experts. Counsel admits that it has not in its present form been fully or completely presented to any court. The defendant commission does not use it. We are cited to no rate case in which it has, at least in its present form, been applied.

The report of the depreciation section of the Bureau of Accounts of the Interstate Commerce Commission, filed in 1923, and entitled "Report of the Preliminary Investigation of Depreciation Charges of Telephone Companies and the Conclusions and Recommendations of the Depreciation Section for the Regulation of such Charges," discusses fully and critically sinking fund methods, and indorses the straight-line method for determining depreciation since "The (Straight Line) Method has been endorsed by leading accountants, courts and regulatory bodies that have been called upon to determine a plan for depreciation accounting. It is the plan which underlies the Commission's present accounting regulation with respect to depreciation, therefore it is recommended that the straight line method be adopted." The method urged by the defendants was rejected by the master. Depreciation expense or depreciation reserve in any industry is a factor of expense determined by long and painful experience. Intelligent cost accounting quite frequently spells the difference between success or bankruptcy in any enterprise. In the present state of the development and acceptance of the defendants' proposed method, we fail to see how we can apply it in the face of generally accepted and prevailing business and accounting practice.

We need add nothing to the discussion here as to reproduction cost less depreciation being the dominant element in the fixing of a rate base in a case such as this, because the matter was fully developed by Judge Denison in the two opinions filed in this court in the case of the Monroe Gaslight & Fuel Company v. Michigan Public Utilities Commission, 292 F. 139; Id., 11 F.(2d) 319. We are satisfied that the master made application of the rules and prin-

ciples there approved. The master made an allowance for working capital on the basis of 2.48 per cent. of the reproduction cost depreciated of the physical property of the plaintiff. This is the allowance made by the commission for working capital, and is not challenged by exception on this record. Going value was found by the master at 8 per cent. of the physical value. The company claimed 10 per cent. and the defendants contended for an allowance of 5 per cent. That a reasonable amount of allowance for going value should be considered in determining a rate base is no longer open to question. McCardle v. Indianapolis Water Company, 272 U. S. 400, 47 S. Ct. 144, 71 L. Ed. 316. The dispute here is as to the percentage of the allowance. In the McCardle Case 9½ per cent. for going value was considered to be sustained by the record. In the Monroe Gaslight & Fuel Company v. Michigan Public Utilities Commission, supra, this court approved an allowance of 10 per cent. In earlier orders fixing rates of return upon the property of this plaintiff by the Michigan Railroad Commission, predecessor of the defendant commission, which orders were reviewed in City of Detroit v. Railroad Commission, 209 Mich. 395, 177 N. W. 306, the percentage allowed for going value was fixed by the state commission at 8 per cent. We confirm the master's allowance.

The application of the master's findings of fact and conclusions of law to the issues presented upon this record is made clear by the summary of rate base and return contained in the report. It follows:

| | | |
|---|---|---|
| Average Fair Value of Physical Property in Service During Period of Year Ending March 31, 1929, for Purposes of Computation of Rate of Annual Return............ | $136,232,372 | |
| Average Going Value for Said Period and Purposes......... | 10,898,590 | |
| Average Working Capital for Said Period and Purposes... | 3,378,563 | |
| Total Average Fair Value Accordingly, for Purposes of Rate Base .................... | $150,509,525 | |
| Amount Required for Payment of Annual Fair Return (7%) on Said Rate Base... | | $10,535,667 |
| Annual Revenues................ | $38,931,407 | |
| Annual Expenses..:............ | 31,427,822 | |
| Balance Available for Annual Return..... | | 7,503,585 |
| Annual Deficit in Amount Required for Fair Annual Return...................... | | $ 3,032,082 |

■ It will be observed that under the orders of the commission here in controversy the amount available to the plaintiff for return upon the fair value of its property as disclosed by the present record would be very slightly in excess of 5 per cent. This falls far short of what we consider a fair return, and, confirming the report of the master, the defendants' orders in dispute are declared invalid because confiscatory of the property of the plaintiff and a violation of its rights under the Fourteenth Amendment of the Constitution of the United States.

■ One other aspect of the present litigation needs to be discussed. We are urged to take judicial notice of the trend of price levels, and to make a reasonable forecast of the future in determining fair value. At the hearing before the master, reliance was placed upon the weekly letter of the Harvard Economic Society for March 15, 1930, which contained some matter in support of defendants' position. It also contained a prediction of an early upturn of prices and a restoration of the horizontal trend which it was estimated might continue for a few years to come. The master found rightly upon the record that there were no proofs then before him to warrant any change in his findings based upon any intelligent forecast of substantial change in the trend of price levels. In the interval between the master's report and the hearing before the court, perhaps no change substantial enough to warrant judicial notice was clearly indicated. However, there can be no doubt that, since the controversy was submitted to us upon argument, there has been a marked change in the situation. We must take cognizance of it. To what extent the change in price levels will affect the reproduction cost criteria for determining fair value we have no means of knowing, nor have we any knowledge as to the effect of present economic conditions either upon the operating costs or upon the operating revenues of the plaintiff. To reopen this case for further proofs would make this litigation endless. Issues are here presented which all parties to the litigation are interested in having determined. We decide them on the present record by confirming the master's findings.

We are now advised, however, that the defendant commission is taking judicial notice of present economic conditions which have or may have a bearing upon the value of plaintiff's property and facilities, and upon its operating expenses, and has ordered the plaintiff to show cause before the commission why its rates, rentals, tolls, and charges should not be revised, such order

186

having been made returnable on November 18, 1930. We have no means of knowing what the new inquiry, if entered upon, will disclose, nor the action of the commission which will result. In view of this new inquiry into the entire subject-matter here presented, we deem it best to direct the following disposition of this cause: That a decree be entered declaring the orders here in controversy invalid; that such decree provide for an injunction restraining the enforcement of such orders; that the entry of the decree be deferred for a period of thirty days to enable the defendants to prepare an appeal; that upon the taking of an appeal the injunction provided for in the decree be stayed pending appeal as provided for by rule 74 of the General Equity Rules (28 USCA § 723).

On Motion for Re-Reference.

The United States Supreme Court having, on December 1, 1930, after the filing of the opinion herein, rendered its decision in Smith v. Illinois Bell Telephone Co., 51 S. Ct. 65, 75 L. Ed. ——, wherein it announced, for the first time, certain conclusions apparently requiring consideration herein, this court, by order entered December 15, 1930, re-referred this cause to the special master for such further proofs and findings as were required by the decision just mentioned, with instructions to also bring down to date the proofs relative to the valuation, revenues, and expenses of the plaintiff company and to report to this court such proofs and his findings of fact and conclusions of law thereon.