**COLUMBUS GAS & FUEL CO. v. CITY OF COLUMBUS.**

(District Court, S. D. Ohio, E. D. February 12, 1927.)

No. 362.

1. **Gas** ⊝14(1)—"Collar leak clamps" held not mere "repairs," but "improvements," to be considered in computing gas rate base.

"Collar leak clamps," being devices used on pipe joints to supplement the old method of joining pipes together and to prevent leakage, held not "repairs," but permanent "improvements," or betterments, which gas company was entitled to have considered in computation of rate base, under reproduction new less depreciation method.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Improvement; Repair—Repairs.]

2. **Gas** ⊝14(1)—Cost of cutting and replacing pavement held properly included in determining gas rate, based on reproduction.

In determining gas company rate base according to reproduction new less depreciation method, cost of cutting and replacing pavement, which was cut at time of original installation, should be included, but not the cost of cutting and replacing all pavement which would be nec-

essary to actual reproduction at time of appraisement.

3. **Gas** ⊝14(1)—Allowance for "undistributed structural costs" held proper for gas rate base.

In gas company rate base case employing reproduction cost new less depreciation method, an allowance for "undistributed structural costs," covering omissions from inventory, contingencies, administration, legal expenses, engineering, superintendents, inspection, taxes, and interest during construction, totaling 17 per cent., held proper.

4. **Gas** ⊝14(1)—Allowance for "going concern value" in gas rate case held proper.

In determining gas company rate base according to reproduction cost new less depreciation method, company was entitled to allowance for "going concern value."

5. **Gas** ⊝14(1)—Allowance of 10 per cent. for going concern value in gas rate base case held reasonable.

In determining gas company rate base according to reproduction new cost less depreciation method, addition of 10 per cent. for going concern value held fair and reasonable.

6. **Gas** ⊝14(1)—Scientific process for determining depreciation of gas mains held not entitled to controlling weight in rate case.

In gas company rate base case, method of determining extent of depreciation of gas mains employed by company's engineer and involving scientific study of samples taken held not entitled to controlling weight, in view of comparative infinitesimal quantity of pipe examined.

7. **Gas** ⊝14(1)—Gas company held entitled to allowance for extensions likely to be required, in determining rate base.

Where extension of mains and services was discontinued by order of court during pendency of rate base case, held, company was entitled to have included in its so-called rate base an allowance for extensions likely to be required during life of ordinance involved, notwithstanding the usual contrary rule.

8. **Gas** ⊝14(1)—Gas company held not entitled to have abandoned mains valued, and then depreciated 100 per cent., for rate base.

Natural gas company in rate base case held not entitled to have abandoned mains of its predecessors valued, and then depreciated 100 per cent., thereby increasing the amount on which allowance for going concern value was figured.

9. **Gas** ⊝14(1)—Natural gas company held not entitled to have abandoned artificial gas main system valued for rate base.

Natural gas company, in rate base case, held not entitled to have valued an artificial gas main system, constructed by its predecessor and long abandoned, notwithstanding claim of intended use.

10. **Gas** ⊝14(1)—Natural gas company held not entitled to have indebtedness, assumed when artificial system was purchased, considered in rate case.

In rate base case, natural gas company held not entitled to have considered outstanding

bonded indebtedness of its predecessor, which it had assumed when artificial system was purchased, notwithstanding refusal to allow valuation of abandoned system of its predecessor

**11. Gas ⊙⊸14(1)—Ordinance requiring. certain number of British thermal units in gas sold held not uncertain.**

Ordinance of city of Columbus, affecting rates on gas required to have a heat value of not less than 900 British thermal units, *held* not indefinite or uncertain for failure to state whether net or gross heat units were intended.

**12. Gas ⊙⊸14(1)—Gas company held not entitled to allowance, as part of rate base, of expenses for legal services and advertising.**

Gas company *held* not entitled to allowance, as part of rate base, of expenses for legal services and for advertising in newspapers in preparation and contemplation of rate base litigation.

**13. Gas ⊙⊸14(1)—Ordinance fixing gas rates, allowing return of 7.078+ per cent. held not confiscatory (Const. Amend. 14).**

Ordinance of city of Columbus fixing gas rates, allowing a rate of return of 7.078+ per cent. return on fair value of property, *held* not confiscatory nor violative of Const. Amend. 14.

**14. Gas ⊙⊸14(1)—Testimony of material and labor costs in another city held properly excluded in gas rate case.**

In gas company rate base case, master's exclusion of testimony of expert witnesses as to material and labor costs in another city *held* proper, or in any event not prejudicial.

**15. Gas ⊙⊸14(1)—City held within its rights in refusing to consent to "engineering conference" in gas rate case.**

In gas company rate base case, city *held* within its rights in refusing to consent to an "engineering conference," and in insisting on proofs from opposing parties.

**16. Constitutional law ⊙⊸70(1)—Whether rate of return satisfies constitutional requirements is judicial question, and whether it is sufficient commercially, is legislative question (Const. Amend 14).**

Whether a rate is sufficient in fulfilling demands of Const. Amend. 14, is a judicial question, but whether it is sufficient to encourage and justify the operation of a utility business is a legislative question.

In Equity. Suit for injunction by the Columbus Gas & Fuel Company against the City of Columbus, in which the city filed a cross-bill, joining the Federal Gas & Fuel Company and the Ohio Fuel Gas Company. Decree in accordance with opinion.

Freeman T. Eagleson and John F. Wilson, both of Columbus, Ohio, for complainant.

Charles A. Leach, City Atty., and James M. Butler and L. F. Laylin, all of Columbus, Ohio, for defendant.

HOUGH, District Judge. The complainant, the Columbus Gas & Fuel Company, owns a natural gas distributing plant in the city of Columbus, Ohio, and together with its predecessors in ownership has furnished natural gas as a public utility to the general public of Columbus, through the instrumentality of such distribution system, for something over 20 years. The gas which is and has been so furnished is purchased at the city gates, from a producing and transportation company, under a contract operative for a period of 20 years from the 1st day of April, 1914, and providing for the payment, in so far as applicable to this case, of 65 per centum of the rates per 1,000 cubic feet, charged by said Columbus Gas & Fuel Company to its domestic consumers in the city of Columbus (less discounts), but not less than 20 cents per 1,000 cubic feet of natural gas.

Immediately prior to the time hereinafter mentioned the complainant company had been furnishing to its customers in the city of Columbus natural gas, pursuant to the rate terms of an ordinance of the city of Columbus, which had lately, under its provisions, expired. On the 4th day of August, 1924, the city council of the defendant city passed an ordinance, effective for a period of five years from the 12th day of September, 1924, and providing for the furnishing of natural gas to the city of Columbus during that period, having a heat value of not less than 900 British thermal units, for the sum of 40 cents for each 1,000 cubic feet so furnished.

The complainant company and the Federal Gas & Fuel Company, the other natural gas distributing company in the city of Columbus, both declined to accept the rate provided for in the ordinance, and on the 29th day of April, 1925, the complainant company filed its bill of complaint in this court, praying for injunctive relief, on the ground that the 40-cent rate provided for in the ordinance was unconstitutional and confiscatory. Upon application and hearing, a preliminary injunction was issued, enjoining the city from making the 40-cent rate effective during the pendency of the case and until the further order of the court, and further fixing a temporary rate, to be in force during the pendency of the suit, in a sliding scale upward, based upon the amount of gas used, to wit, 55 cents, 65 cents, and 75 cents per thousand, with a minimum monthly charge of 75 cents, further ordering that the excess of this rate over and above that which may finally be fixed by the appropriate and proper rate-fixing authority should be im-

pounded, to be disposed of by a subsequent order of the court.

The city filed its answer to the bill of complaint and its cross-bill thereto. To the cross-bill, the Federal Gas & Fuel Company, being the other distributing natural gas company in the city of Columbus, filed its separate answer; the Ohio Fuel Gas Company, the producing and transportation company, filed its separate answer; the Ohio Fuel Supply Company, a holding company, filed its separate answer; and the complainant filed its reply to the Federal Gas & Fuel Company's answer. The cause was then referred to a special master to take the testimony and report to the court his findings of fact and conclusions of law, according to the terms of the order of reference, but particularly upon the issue in respect to the constitutionality of the rate ordinance.

The report of the master, as contemplated by the order, has been filed, together with a transcript of the testimony taken, exhibits, briefs, arguments, engineering data and detail, etc., and the case has been submitted to the court upon the pleadings, the application of the defendant city to confirm the master's report, the exceptions of the complainant, the Columbus Gas & Fuel Company, and the defendant the Federal Gas & Fuel Company to the confirmation and the brief and arguments of counsel upon the exceptions.

The evidence in respect to the complainant, the Columbus Gas & Fuel Company, was first taken before the master, and followed with the evidence applying to the valuation of the Federal Gas & Fuel Company. It was then stipulated that the evidence taken in behalf of the complainant company should be used, as far as applicable, in the determination of the fair value of the properties of the Federal Gas & Fuel Company. The same counsel represented both companies in the production of the evidence and the hearings and arguments before the special master and before the court upon exceptions. The engineering data was prepared by the same parties in respect to both gas companies, and the expert testimony was tendered by the same group of expert witnesses. The exceptions filed to the master's report and findings are sufficiently broad and numerous to put in review practically the entire scope of the issues made by the pleadings and covered by the master's report and findings.

In the submission of the case to the special master, there was apparently very little common ground and understanding, except that the contending parties proceeded upon the reproduction new less depreciation theory, as of the 31st day of August, 1925. A large proportion of the great mass of evidence and data taken came very naturally under the classification of opinion evidence, and the contentions and disputes under this class of evidence were very sharply drawn and of a widely diversified effect, both in theory and substance. The whole record is illustrative of the wisdom of cautiously and carefully analyzing this character of evidence, and remembering that expert witnesses may usually be classified as partisan witnesses. The accord between the contending parties in directing the proof to the reproduction new less depreciation value, as of an accepted present date, is helpful, and is approved as a practical method under the circumstances and situation presented in this case. As the courts have said, this method, while not necessarily more than an element of ascertaining fair value, has frequently, and perhaps usually, intervened as a commanding and dominating element. Monroe Gaslight & Fuel Co. v. Michigan Public Utilities Commission (D. C.) 11 F.(2d) 319; Bluefield Co. v. Public Service Commission, 262 U. S. 679, 43 S. Ct. 675, 67 L. Ed. 1176; Southwestern Telephone Co. v. Public Service Commission, 262 U. S. 276, 43 S. Ct. 544, 67 L. Ed. 981, 31 A. L. R. 807; Georgia Railway & Power Co. v. R. R. Co., 262 U. S. 625, 43 S. Ct. 680, 67 L. Ed. 1144; McCardle and others v. Indianapolis Water Co., 47 S. Ct. 144, 71 L. Ed. ——, decided November 22, 1926.

It seems appropriate to remark that, had the desire of mutual understanding been more apparent, the spirit of conciliation and compromise been more manifest, such a course would have been reflected in a much less voluminous record, and an immense saving of time and expense, which has and will inure to the disadvantage of the parties to this suit and the natural gas patrons of the city of Columbus. Considering the methods adopted by the two companies, their history, and the circumstances and relationship of their operations, the reproduction cost new less depreciation theory, for the purpose of determining fair value, would seem to be a proper and appropriate method of testing the confiscatory character of the ordinance.

The Columbus Gas & Fuel Company, hereafter called the Columbus Company, and the Federal Gas & Fuel Company, hereafter called the Federal Company, while of common ownership, were dealt with separately by the master, pursuant to the terms of the order of reference, and in the interests of

clarity will be dealt with separately to some extent in this opinion. (Since the filing of the report and findings of the master, the companies have changed ownership, but are still under one ownership.)

In the appraisement of the properties with a view of ascertaining value, there has been included both tangible and intangible property. Of the class of tangible property, a substantial proportion of the value thereof is underground, and in fact a substantial value of the entire property of all classes is included in the mains and services making up the natural gas system.

In order to arrive at the reproduction cost new of the underground systems, we are concerned with the cost of material (that is, pipe and fittings) and the cost of installation (that is, common and expert labor, in making the excavations, laying the pipe, making connections and fittings, back-filling the trenches), and this involves, over a portion of the territory to be covered, the cutting of pavement and the repaving of the surface after installation. Numerous and varied other costs in detail properly come as a part of the aggregate cost of reproduction new, such as superintendents, foremen, office force, bookkeeping department, and miscellaneous and incidental expenses without number.

Speaking of the value making up the aggregate of reproduction cost new of the Columbus Company, that aggregate as developed by the company is $7,626,502. The same cost as developed by the witnesses for the city amounts to $2,684,765, while the master's finding on the same was $3,258,246. These figures are illustrative of the sharp conflicts and differences in opinion and judgment, method of calculation, inclusion and exclusion of various elements of value, etc., which were present in the conduct and the development of the case. The acceptance of the figures of the company by the city, in some minor instances, represents the only instances of accord between the parties to the litigation. It would seem that a difference of $5,000,000 in value on a $7,000,000 property, which is the highest value advanced by any one, could not be possible, on any theory evincing a frank, open, unprejudiced attitude and a sincere desire to arrive at the real cold facts, in order to bring about a fair value and a fair result.

We go to the various items that are used to make up these very divergent aggregates, and consider first the mains. There is very little substantial difference between the par-

ties in the cost of material under that head. The master adopted the figures of the company, and the court will do likewise. There is also a not very important difference between the city's labor costs of installation and what the company terms as primary laying costs. The master accepted the company's primary laying costs, which the court will do likewise, adding thereto an item of $27,565.23 listed in the city's set-up under the head of incidental expenses.

In the theoretical reconstruction new of a natural gas system such as this, an organization would of necessity have to be provided, which would function during the period of construction. A further item has therefore been added by the court, called "organization cost of construction." This includes a superintendent, two assistant superintendents, an engineer, an office manager and auditor, a bookkeeper and assistants, and other miscellaneous costs, figured upon a two-year basis as a reasonable period for construction, and amounts to $73,600.

[1] An item designated "collar leak clamps" was carried in the company's appraisement, amounting to $104,842. This item was omitted in the city set-up, and also eliminated in the master's finding. From an examination of the evidence in the case we find that collar leak clamps are devices coming into use in comparatively recent years, which are clamps used upon pipe joints to supplement the old method of joining the pipes together and to prevent leakage. Extensive use of these clamps has been employed in the natural gas mains. The question arises whether this item of value should be classified as a repair, or as a permanent improvement or betterment. The court is inclined to the latter view, which is in conflict with the claim of the city and the finding of the master. This item is therefore added in the present computation, plus an item for valves, cocks, couplings, railway and river crossings of $22,671 allowed by the master.

[2] The company contends that, under the reproduction new theory, the cost of cutting and replacing all pavement that, at the time of the appraisement, which had been constructed over the mains in the natural gas system, properly enter into the reproduction cost new. On the other hand, the city claims that only such pavement as was cut at the time of original installation should now be carried in that value. The master's finding is in accord with the city's contention, and is correct. Rate-making bodies have been confronted with this question, and the weight

of these holdings is so strong that the exclusion of all costs for paving cut and replaced, other than that cut and replaced at the time of the original installation, has become the almost universal rule. Spurr, Principles of Public Service Regulation, vol. 2, c. 26; Des Moines Gas Co. v. Des Moines, 238 U. S. 153, 171, 35 S. Ct. 811, 59 L. Ed. 1244. This conclusion adds to the reproduction cost, for paving actually cut, the item of $39,876.

For the theoretical reconstruction of services, the parties are substantially agreed on basic material and labor costs and upon unit gang performance, the difference appearing in the number of unit gang performances in a day performance, or the number of services that can be installed by the unit gang in a day, the Columbus Company basing its figures upon 10.3 services per day and the city 17 services per day, and in the material item as it relates to the type and quality of connections and fittings. The contention of the gas company is that each service is an independent piece of work, and so considered will permit only 10.3 services to be constructed in a day. The city's contention is that in reconstructing a plant new, as of a certain period, systematic construction of services as a whole and coincident with the construction of the mains will be possible and practical, which systematic plan would permit the installation of services at the rate of 17 per day.

Both arguments have a certain and limited sound basis in the theoretical reconstruction of the plant. In the practical performance of the systematic task, services could be placed under construction in certain sections of the city and in certain parts of the system collectively, and in conjunction with the construction and installation of the mains. While at other places and under other conditions it is quite probable that the construction and installation of services would of necessity become independent tasks. The master adopted the view presented by the city, but the court is of the opinion that, in the practical working out of the reconstruction, a less average number of performances would be possible per day than is contended for by the city and a greater number possible than is contended for by the Columbus Company. The conclusion of the court is therefore that a fair daily performance would be 14 services.

Such conclusion adds to the reproduction cost under this item $540,885, plus $10,187 for paving actually cut in original installations, making a total for the item of services of $551,072. This brings us to a total of the cost of underground construction, mains and services, the sum of $2,992,253.

The remaining physical property, other than land, is dealt with, valued, and depreciated, item by item, by the master under a heading that may be designated "Other Physical Property." Both the value and the depreciation are taken from the figures of the Columbus Company, except the depreciation upon two items, namely, the holder station structure and the holder station equipment. The former the master depreciated 15 per cent. and the latter 20 per cent. It appeared from the evidence that these two items had been in service for more than 20 years, and had been adapted from the old artificial system to use in the natural gas system as a reservoir or storehouse for the natural gas. The company's experts testified that a much less percentage of the value would be necessary to put this property in repair. The question of the repair to the holder station structures was limited to painting the outside. Considerable conflict in the testimony exists. In one instance cross-examination of one of the company's witnesses showed a much higher percentage of depreciation testified to by that witness in another case. The master's conclusion in this respect is considered fair and by no means unreasonable. The total of the property under this classification, namely, "other physical property," is $427,402, which is approved by the court.

[3] Another classification of property was offered by the engineers of the Columbus Company, designated "Undistributed Structural Costs," made up of the following items, upon a percentage basis: Omissions from inventory, contingencies, administration, legal expenses, engineering, superintendents and inspection, taxes during construction, interest during construction. These items total 17 per cent. and were allowed by the master and are considered proper by the court. This percentage applied to the figures above mentioned will result in the addition under this item of $581,341.

There is no disagreement between the parties upon the value of the land appreciated 10 per cent. This item is $97,427, allowed by the master and approved by the court. The total appraisal for all the physical property of the Columbus Company under the methods and calculations employed by the court thereby amounts to $4,098,423.

[4] The master made no allowance for "go-

ing concern value"; the company contending strenuously for an allowance as such, and the city denying its right to have a "going concern value" introduced as an element in reproduction cost. In declining to make allowance for "going concern value" the master stated that under the Ohio rule announced, by the Supreme Court and followed by the Public Utilities Commission of Ohio, no allowance for going concern value or attaching business is made, unless that value or cost has been established by direct evidence. The court is of the opinion that no such rule has been announced by the federal courts, but, on the other hand, going concern value has been a recognized element of value by the Supreme Court and inferior federal courts. Attention is directed to the following cases: McCardle and others v. Indianapolis Water Co., 47 S. Ct. 144, 71 L. Ed. —— (decided November 22, 1926); Des Moines Gas Co. v. Des Moines, 238 U. S. 153, 165, 35 S. Ct. 811, 59 L. Ed. 1244; Denver v. Denver Union Water Co., 246 U. S. 178, 191, 192, 38 S. Ct. 278, 62 L. Ed. 649; Monroe Gaslight & Fuel Co. v. Michigan Public Utilities Commission (D. C.) 11 F.(2d) 319.

[5] The master indicated, however, that, if any allowance at all were made, his judgment would dictate 10 per cent. addition for going concern values. Such a percentage is considered fair and reasonable and is adopted. Omaha v. Omaha Water Co., 218 U. S. 180, 202, 30 S. Ct. 615, 54 L. Ed. 991, 48 L. R. A. (N. S.) 1084; Denver v. Denver Union Water Co., 246 U. S. 178, 184, 38 S. Ct. 278, 62 L. Ed. 649; Bluefield Co. v. P. S. C., 262 U. S. 679, 686, 43 S. Ct. 675, 67 L. Ed. 1176; Southern Bell T. & T. Co. v. R. R. Commission (D. C.) 5 F.(2d) 77, 87; Consolidated Gas Co. v. Prendergast (D. C.) 6 F.(2d) 243, 259; Kings County Lighting Co. v. Prendergast (D. C.) 7 F.(2d) 192, 217; and many other cases. The percentage adopted, translated into dollars, results in $409,842.00 to be added as going concern value.

The next subject for consideration in proper order is the matter of accrued depreciation of the physical property other than land. Under the heading "Other Physical Property," the depreciation of the master was approved, supra. The total amount of depreciation of the various items under this classification is $72,915.

[6] The method employed by the company's engineer in depreciating the natural gas mains is set out in Company's Exhibit No. 16. The method contained therein, according to its author, was developed in recent years. Sixty-six samples of pipe, six inches long, were taken from the natural gas system, together with many soil samples. The company's engineer and his assistants made an examination of these samples of pipe for the purpose of ascertaining their weight and wall thickness and pitting. The formula used was to compute the weight of each sample of pipe, and then determine loss, if any, by use of standard tables of weight of pipe. The wall thickness of each sample was measured at several points and the smallest or minimum measurement was selected. This was compared with the wall thickness of new pipe, and the percentage of loss of wall thickness was computed. The formula then subjected the pipe to an examination to determine the amount of pitting.

The deepest pit was taken as a basis, and then it was assumed that the pipe was corroded over its entire surface in an amount equal to one-third of the maximum pitting depth. The loss thus found was computed in percentages. The average loss of wall thickness, the average loss of weight, and the average depth of pitting having been determined, the weighted average of the three was taken as giving an average loss of metal or depreciation of the mains. This scientific process was worked out by means of micrometer screw gauges, microscopes, and other paraphernalia. The process brought forth five answers, applied to different classes of pipe and influenced by different soil conditions. The results are interesting and are approximately 7 per cent., 10.3 per cent., 7 per cent., and minus 5.6 per cent. and, as to service pipes, 10.3 per cent. One class of pipe, instead of having depreciated by something over 20 years of use, had appreciated in wall thickness and weight.

This process of depreciation took into account no general depreciation on account of age and usage. It was an attempt to arrive at a figure for depreciation by inspection, visual examination, the useful location of which was underground and beyond the possibility of any reasonable inspection. Sixty-odd samples of pipes, or a total length of about 30 feet, would not to any great degree reflect the condition of over 300 miles of natural gas mains and many miles of services. The inspection method is entirely proper and decidedly preferable, where it can be effected. McCardle v. Indianapolis Water Co., 47 S. Ct. 144, 71 L. Ed. —— (decided November 22, 1926); Pacific Gas Co. v. San Francisco, 265 U. S. 403, 406, 44 S. Ct. 537, 68

L. Ed. 1075; Standard Oil Co. v. Southern Pacific Co., 268 U. S. 146, 159, 45 S. Ct. 465, 69 L. Ed. 890. The infinitesimal quantity of pipe submitted as samples, in comparison with the quantity of pipe making up the system, appeals to the court as being proper and competent evidence, subject to weight, and under such circumstances worthy, by no means, of controlling weight.

Concerning this troublesome subject much conflict in theory and opinion exists. South Western Bell Telephone Co. v. P. S. C., 262 U. S. 276, 294, 43 S. Ct. 544, 67 L. Ed. 981, 31 A. L. R. 807. Age and usage to which the metal has been subjected, even under favorable soil conditions, such as found in Columbus, together with the corrosion, electrolysis, metal strain, fatigue and crystallization to which the mains have been subjected for many years, just naturally presents themselves with undeniable force, to be taken into consideration as an element of depreciation. The element of age is considered as an essential in arriving at a proper, just, and fair accrued depreciation of the property. It is an element that is generally known and must be accepted—the result of judgment applied to common knowledge.

The method adopted by the company's engineers is not convincing nor clarifying, but confusing and unappealing to common sense and judgment. It is only a pro tanto coverage of the subject. Based upon its own judgment, considering the age element and all the evidence and circumstances surrounding the subject, the accrued depreciation of the mains and services is fixed at 16⅔ per cent. Converting this percentage into figures brings $583,489 in amount, which, added to the depreciation of the property under the heading "Other Physical Property," of $72,915, plus 17 per cent. structural cost depreciation makes a total accrued depreciation of $668,799, which, deducted from the reproduction value new of all physical property, gives the fair value of the physical property, plus going concern value to wit, $3,839,466.

To this amount it then becomes necessary to add the tangibles. The master allowed $15,127 for construction work in progress on the 31st of August, 1925, and $36,893 for material and supplies on hand. These items are approved. For cash working capital, the master's allowance was $60,000. The company's engineer, by his method of computation, found an amount contended for of $325,000 plus. The city's engineer, on the other hand, from an analysis of the operating expenses and based upon one-eighth of the actual expense, upon a six weeks pay roll and tax accrual, contends for an amount less than $60,000. Of course, it must be remembered that the company is a distribution company, and buys the gas wholesale, delivered at the city gates, and monthly receipts from customers are convertible to the payments to the furnishing company. However, the $60,000 amount allowed, considering the size and volume of the business, seems to the court too low. That item will be fixed at $100,000.

[7] Under the injunctive order of the court, extensions of mains and services were discontinued during the pendency of the suit. Requirements for extensions have no doubt accumulated during this period, and prospective customers not heretofore served with gas are waiting to be served. It may be somewhat of a departure from customary commission methods of handling such a problem, but the court is of the opinion that an allowance should be made, to go into the so-called rate base, for extensions which will probably be called for during the life of the ordinance, a period of four years. Usually the return for this additional outlay of capital may be anticipated to be taken care of under future operating profit. But the issue here is the test of the constitutionality under favor of the Fourteenth Amendment of the Constitution of the United States, and it appears to the court that it is an element that may in fairness be taken into consideration. Monroe Gaslight & Fuel Co. v. Michigan P. U. C. (D. C.) 11 F.(2d) 319, 323. The amount fixed is an estimated outlay of $20,000 a year for a period of four years, or $80,000. The total of tangibles to be added is therefore $232,020, which, added, gives an aggregate fair value, or, as applied to a rate case, an aggregate rate base, of $4,071,486.

[8] A number of claimed elements of value by the Columbus Company are found in the record to have been tendered and insisted upon, which were denied by the master in his report and findings. The first of these in the proper sequence appears under the heading "Abandoned Mains." This property is given value by the company's engineers in the rate base, and depreciated 100 per cent. This method of handling will, of course, only effect the total upon which the percentage of going concern value is figured, and raise the total amount of accrued depreciation. There is no claim that this property is used and

useful in the business of the company. It should be entirely disregarded.

[9] Artificial mains is the next subject to be considered. An artificial gas main system was constructed in the city of Columbus, perhaps in the year 1889, and was in operation, furnishing artificial gas until after natural gas came into general use. The predecessors in ownership of the Columbus Company purchased the artificial gas system in 1905, and in 1911 discontinued the manufacture and sale of manufactured gas, and in 1912 surrendered the artificial gas franchise. With the exception of a very limited portion of the artificial mains, which were used to tie in the gas holder with the natural gas system in the year 1913, and another very limited portion of the mains, which were tied in the natural gas system in 1919, the artificial system has been in absolute disuse during all those years, until subsequent to the 31st day of August, 1925, and to the institution of this suit, when the evidence discloses that some movement was on foot to put additional parts of the system into use. This latter movement can only be interpreted under the facts and circumstances disclosed by the record to have been begun for the purpose of influencing the claim of the Columbus Company for the inclusion of the value of the artificial system in the fair value of the property.

The circumstances point with impressive emphasis to the conclusion that this class of property, other than that mentioned as being actually used, which by the way was included as an element of value with the natural gas system by the master, was dead property, and the finding is that for the purpose of this suit, and so far as the constitutional test of this ordinance is concerned, and over the period of time in which the ordinance by its terms is to be operative, the property is not used and useful, nor in imminent probability of being used and useful, in the service of the Columbus Company, for the purpose of serving its customers in Columbus with natural gas. Spurr, Principles of Public Service Regulation, c. 29, p. 80. "That property which has been superseded and abandoned, and is no longer used in public service should not be included in the valuation of public utility property, is recognized by the Supreme Court of the United States, on the ground that this constitutes depreciation." Knoxville v. Knoxville Water Co., 212 U. S. 1, 29 S. Ct. 148, 53 L. Ed. 371. Nor are principles laid down in the case of Pacific Gas Co. v. San Francisco, 265 U. S. 403, 44 S. Ct. 537, 68 L. Ed. 1075, in conflict with this principle. The facts of that case, when considered in conjunction with the facts of the instant case, persuades that the principles therein announced are not applicable here.

[10] The Columbus Company contended that, if the valuation under the artificial main account was disallowed, then the company was entitled to consideration of the fact that more than $1,300,000 bonded indebtedness was standing against their property, which had been assumed when the artificial system was purchased. This it was claimed should be done by making provision for the payment of interest and amortization of the unpaid portion of the bond issue outstanding. The company has not been able, in order to fortify its position upon this contention, to show, or at least it has not shown, that there has ever been, during past years, any amortization in order to provide for interest and retirement of the bonds.

When it is remembered that the property has been operated for a good many years with the bond issue outstanding, and presumably has paid dividends to its stockholders, and has accumulated a reserve account, as shown by its books, of over $600,000, it is not easy to conclude otherwise than that the general public in Columbus has paid this indebtedness, and that it would be unreasonale and unfair to charge it against the future natural gas purchasing public. The master's conclusion on this subject is approved, and the principles laid down in the Pacific Gas Case, supra, are not controlling under the facts and circumstances appearing here.

[11] The Columbus Company contends that the ordinance in question is invalid for the reason that, where it deals with British thermal heat units, a vagueness develops, for the reason that the ordinance is silent as to whether "net" or "gross" heat units are intended. The master's conclusion upon this question is sound and reasonable, that indefiniteness and uncertainty in a legislative enactment will be resolved in favor of that interpretation which will sustain its validity.

Other elements of value, advanced by the Columbus Company through its witnesses, were eliminated by the master. The method adopted by the company's engineer witnesses was to tender a set-up of what they termed "primary laying costs," or "laying costs," and it is explained that these costs are developed and figured on the basis of "open country" or "prairie" conditions. After this cost has been determined, they figuratively

transfer their project to the streets of the city of Columbus, and superimpose what they term "street and alley costs," including bridging street intersections, entrances to garages and private premises, tunnels under street railway tracks, rock excavation and removal of boulders, other subsurface obstructions, injury and repairs to private property, injury and damages to utility property, special shoring and sheathing, barricades and watchmen, unwatering trenches, tool and equipment, garage and automobile expense, and city inspectors.

Then a further classification is superimposed, designated "special labor costs," composed of such items as securing labor, increased wages of pipe-laying gangs, lost time due to interruptions, lost time of "steady pay" men, winter suspension of work, night and Sunday work, liability and compensation insurance, and, further, what they term

"constructor's organization cost," including construction department cost, bookkeeping department cost, time-keeping department cost, and miscellaneous cost. These superimposed elements of value aggregate nearly $1,-000,000.

Except for the overhead cost of maintaining an executive, engineering, bookkeeping, and supervisory organization, which has heretofore received treatment, the master was correct in eliminating these various items of value. With the plan conceived by the company's engineers, creating a basic structure upon which to impress, attach, and superimpose every and all conceivable and imaginable items of cost, like barnacles on a ship's hull, the court is not in sympathy.

The method of arrival at the aggregate fair value of the Columbus Company, to wit, $4,071,486.00, is evidenced and explained by the following summary:

### The Columbus Gas & Fuel Company.

| | Reproduction Cost New. | Depreciation. | Reproduction Cost Depreciation. |
|---|---|---|---|
| Land | $ 88,570.00 | | $ 88,570.00 |
| Measuring station structures | 12,897.00 | $ 943.00 | 11,954.00 |
| Measuring station equipment | 11,291.00 | 89.00 | 11,202.00 |
| District regulator structures | 11,808.00 | 3,439.00 | 8,369.00 |
| District regulator equipment | 29,936.00 | 406.00 | 29,530.00 |
| Distribution system structures | 14,606.00 | 195.00 | 14,411.00 |
| Holder station structures | 176,509.00 | 26,476.00 | 150,033.00 |
| Holder station equipment | 6,691.00 | 1,338.00 | 5,353.00 |
| Mains: | | | |
| Material | 1,486,265.00 | | |
| Installation costs | 787,527.00 | | |
| Valves, cocks, couplings, railway and river crossings | 22,671.00 | | |
| Collar leak clamps | 104,842.00 | | |
| Paving over mains actually cut and replaced | 39,876.00 | | |
| Total mains | 2,441,181.00 | $406,863.00 | 2,034,318.00 |
| Services: | | | |
| Natural gas services | 540,885.00 | | |
| Paving over services actually cut and replaced | 10,187.00 | | |
| Total services | 551,072.00 | 91,845.00 | 459,227.00 |
| Meters in service | 69,547.00 | 10,432.00 | 59,115.00 |
| Regulators: | | | |
| Industrial | 1,164.00 | 174.00 | 990.00 |
| House | 21,465.00 | 3,219.00 | 18,246.00 |
| Office furniture | 15,516.00 | 2,327.00 | 13,189.00 |
| Office fixtures | 21,739.00 | 15,217.00 | 6,522.00 |
| Utility equipment | 25,705.00 | 6,426.00 | 19,279.00 |
| Garage equipment | 2,041.00 | 612.00 | 1,429.00 |
| Tools and equipment | 6,487.00 | 1,622.00 | 4,865.00 |
| Total without land | $3,419,655.00 | $571,623.00 | $2,848,032.00 |
| Undistributed structural costs | 581,341.00 | 97,176.00 | 484,165.00 |
| Land, plus 10 pct. overhead charges | 97,427.00 | | 97,427.00 |
| Totals | $4,098,423.00 | $668,799.00 | $3,429,624.00 |
| Going concern value | 409,842.00 | | 409,842.00 |
| Construction work in progress | 15,127.00 | | 15,127.00 |
| Materials and supplies | 36,893.00 | | 36,893.00 |
| Cash working capital | 100,000.00 | | 100,000.00 |
| Extensions suspended by order of court, and estimated necessary during four years' operation of ordinance | 80,000.00 | | 80,000.00 |
| Grand totals: | | | |
| Reproduction cost new | $4,740,285.00 | | |
| Depreciation | | $668,799.00 | |
| Reproduction cost depreciated, total and aggregate fair value | | | $4,071,486.00 |

The same identical principles, methods of calculation, approvals, modifications, and disapprovals of the master's findings is subjected to the Federal Company, and is exemplified by the following summary, resulting in an aggregate fair value, or rate basis total of $1,553,290:

the process of determining the constitutionality of the rate ordinance, is an examination of the gross earnings, operating expenses, net earnings, deductions to be made in respect thereto from the evidence, with extensions and tabulations which will result in the finding of an amount which will be the com-

The Federal Gas & Fuel Company.

| | Reproduction Cost New. | Depreciation. | Reproduction Cost Depreciated. |
|---|---|---|---|
| Land and private rights of way | $ 6,263.00 | | $ 6,263.00 |
| Measuring station structures | 574.00 | $ 31.00 | 543.00 |
| Measuring station equipment | 1,456.00 | 16.00 | 1,440.00 |
| District regulator structures | 5,963.00 | 1,173.00 | 4,790.00 |
| District regulator equipment | 15,437.00 | 158.00 | 15,279.00 |
| Mains: | | | |
|   Material | 451,232.00 | | |
|   Installation costs | 301,168.00 | | |
|   Valves, cocks, couplings, railway crossings | 20,074.00 | | |
|   Paving over mains actually cut and replaced | 40,165.00 | | |
|   Total mains | 812,639.00 | 135,440.00 | 677,199.00 |
| Services: | | | |
|   Natural gas services | 197,846.00 | | |
|   Paving over services actually cut and replaced | 8,371.00 | | |
|   Total services | 206,217.00 | $34,370.00 | 171,847.00 |
| Meters in service | 266,988.00 | 40,048.00 | 226,940.00 |
| Regulators | 8,897.00 | 1,134.00 | 7,563.00 |
| Office furniture | 7,758.00 | 1,164.00 | 6,594.00 |
| Automobile and garage equipment | 13,873.00 | 3,468.00 | 10,405.00 |
| Tools and implements | 3,244.00 | 811.00 | 2,433.00 |
| Total without land and private rights of way | $1,343,046.00 | $218,013.00 | $1,125,033.00 |
| Undistributed structural costs | 214,887.00 | 34,882.00 | 180,005.00 |
| Land and private rights of way plus 10 per cent. overhead charge | 6,889.00 | | 6,889.00 |
| Totals | $1,564,822.00 | $252,895.00 | $1,311,927.00 |
| Going concern value | 156,482.00 | | 156,482.00 |
| Material and supplies | 19,890.00 | | 19,890.00 |
| Cash working capital | 35,000.00 | | 35,000.00 |
| Extensions suspended by order of court and estimated necessary during 4 years' operation of ordinance | 30,000.00 | | 30,000.00 |
| Grand Totals: | | | |
|   Reproduction cost new | $1,806,194.00 | | |
|   Depreciation | | $252,895.00 | |
|   Reproduction cost depreciated, total and aggregate fair value | | | $1,553,299.00 |

The reasonable limits of this opinion forbid going into the various details and analysis, and subjecting the same to the identical reasoning to arrive at results, nor is this considered at all necessary.

The Federal Company having been subjected to the same treatment as the Columbus Company, there being a common ownership of these companies, as well as a common ownership also with defendant the Ohio Fuel Supply Company, the holding company, and the defendant the Ohio Fuel Gas Company, producing and transportation company, the figures and tabulations of said companies are consolidated and combined. The combined total of the amounts applied to each company as its aggregate fair value is $5,624,785.00.

The next thing to be given attention in

pensation to the stockholders, from the operation of the business.

Speaking first of the relationship of these subjects to the Columbus Company, the master finds that before the beginning of this litigation, and for the year ending March 31, 1925, at the then existing rate of 49 cents plus per 1,000 cubic feet, the sale of gas to its customers amounted to 5,204,269 M cubic feet, and that under a 40-cent rate, a larger volume of gas would be used, upon the principle that a decreased rate would increase consumption, and that further, during that period, the rate controversy was being waged, and that the company declined to make extensions and to take on new customers. Because of these conditions, the master found that, upon relief from the conditions, the sale of gas would increase 10

per cent. The master's finding is upheld as being reasonable and fair, and is approved.

This gives an annual sale figure of $5,724,696 M cubic feet.

Forfeited discount and meter sales profit are not questioned, and are approved. The master's method and the result obtained, that the average yearly amount of gas purchased for consumption is 4.4 per cent. greater than the amount sold, is also approved. The findings in reference to the other items of operating expenses, as determined by the master, are approved. The various classes of taxes are readjusted to conform to the amounts found by the court, but under the same formula used by the master.

[12] Two items, namely, $22,050.07, designated "rate case expense," and $15,000, designated "advertising expense," claimed by the company as items properly to be included in general expense, were eliminated by the master. These expenses are for legal services and for advertising in newspapers in preparation and contemplation of this litigation. These were the original items of a continuous line of extraordinary expense attributable and chargeable to the trial of the instant case. The court is of the opinion that they are not allowable.

Legal expenses in connection with rate cases have been given the stamp of approval by courts, when these expenses have been incurred in rate litigation before commissions and before courts. Monroe Gaslight & Fuel Co. v. Michigan P. U. C. (D. C.) 11 F. (2d) 319, 325; Winona v. M. W. L. & P. Co. (D. C.) 276 F. 996. And also such items have been allowed in equity cases, such as this, where the finding was confiscation. Patterson v. Mobile Gas Co. (D. C.) 293 F. 208. The court is able to find no decision, however where the court has held directly that the legal expense of the utility, arising in preparation and prosecution of its claim of unconstitutionality, is allowable. to directly produce or influence that unconstitutionality. Such would appeal to the court to be unreasonable as well as inequitable.

The method of arriving at the depreciation reserve and the 1½ per cent. result obtained by the master is approved. This process gives as net available for return on value of the Columbus Company property, the sum of $305,030.70. The following tabulation is further explanatory of this subject:

The Columbus Gas & Fuel Company.

| Operating income: | |
|---|---|
| Earnings from sale of gas, 5,724,696 M at 40¢ per M cu. ft. | $2,289,878 40 |
| Forfeited discount | 18,837 85 |
| Meter sales profit | 6,359 00 |
| Total operating income | $2,315,075 25 |

| Operating expenses: | |
|---|---|
| Gas purchased 5,976,583 M at 26¢ per M cu. ft. | $1,553,911 58 |
| Distribution expense | 85,348 71 |
| Attending gas purchased | 3,679 29 |
| Commercial expense | 79,994 80 |
| General expense | 60,105 37 |
| 2 per cent. added account increased consumption | 4,582 56 |
| Taxes: | |
| Property | 95,372 73 |
| Excise | 27,780 90 |
| Public Utilities Commission | 1,538 47 |
| Capital stock | 3,646 53 |
| Federal income | 34,068 67 |
| Total operating expense | $1,950,029 61 |
| Net operating income: | |
| Applicable to depreciation reserve and return on value of property | $365,045 64 |
| Depreciation reserve | 60,014 94 |
| Net available for return on value of property | $305,030 70 |

A like treatment has been given this subject in so far as it relates to the Federal Gas & Fuel Company, and the following tabulation will give the results obtained. The amount of net available for return on value of property to this company is $93,125.79:

The Federal Gas & Fuel Company.

| Operating Income: | |
|---|---|
| Earnings from sale of gas, 2,075,558 M, at 40¢ per M cu. ft. | $830,223 30 |
| Forfeited discount | 6,206 10 |
| Total operating income | $836,429 30 |

| Operating expenses: | |
|---|---|
| Gas purchased, 2,179,336 M, at 26¢ per M | $566,627 36 |
| Distribution expense | 25,105 25 |
| Attending gas purchased | 1,654 21 |
| Commercial expense | 39,124 42 |
| General expense | 32,066 45 |
| 2 per cent. added account increased consumption | 1,959 01 |
| Taxes: | |
| Property | 28,311 54 |
| Excise | 10,037 15 |
| Public Utilities Commission | 577 03 |
| Capital stock | 1,168 41 |
| Federal income | 13,303 69 |
| Total operating expense | $719,934 52 |
| Net Operating income: | |
| Applicable to depreciation reserve and return on value of property | $116,494 78 |
| Depreciation reserve | 23,368 99 |
| Net available for return on value of property | $93,125 79 |

The figures that go to make up the last two tabulations appear in combined form in the following tabulation, and give net available for return on value of the properties of the Columbus Gas & Fuel Company and the Federal Gas & Fuel Company combined, an amount of $398,156.49:

The Columbus Gas & Fuel Company and The Federal Gas & Fuel Company.

(Combined Statement.)

| Operating income: | |
|---|---|
| Earnings from sale of gas, 7,800,254 M, at 40¢ per M cu. ft. | $3,120,101 60 |
| Forfeited discount | 25,043 95 |
| Meter sales profit | 6,359 00 |
| Total operating income | $3,151,504 55 |

Operating expenses:

| | | |
|---|---:|---:|
| Gas purchased, 8,155,919 M, at 26¢ per M cu. ft. | $2,120,538 | 94 |
| Distribution expense | 110,453 | 96 |
| Attending gas purchased | 5,333 | 50 |
| Commercial expense | 119,119 | 22 |
| General expense | 92,171 | 82 |
| 2 per cent. added account increased consumption | 6,541 | 57 |
| Taxes: | | |
| Property | 123,684 | 27 |
| Excise | 37,818 | 05 |
| Public Utilities Commission | 2,115 | 50 |
| Capital stock | 4,814 | 94 |
| Federal income | 47,372 | 36 |
| Total operating expense | $2,669,964 | 13 |
| Net Operating income: | | |
| Applicable to depreciation reserve and return on value of property | $481,540 | 42 |
| Depreciation reserve | 83,383 | 93 |
| Net available for return on value of property | $398,156 | 49 |

The aggregate fair value, $5,624,785.00, and the total net available for return on value of property, $398,156.49, mathematically produce a rate of return of 7.078 plus per cent.

[13] Under the facts of the case and the circumstances and situations which surround the parties to this suit, with a rate of return, as above mentioned, to the two utilities distributing natural gas in the city of Columbus, Ohio, it cannot be said that the guarantees afforded by the United States Constitution have been infringed and this rate of return is found to be nonconfiscatory. McCardle v. Indianapolis Water Co., 47 S. Ct. 144, 71 L. Ed. —— (decided Nov. 22, 1926); Monroe Gaslight & Fuel Co. v. Michigan P. U. C. (D. C.) 11 F.(2d) 319.

[14] Strenuous complaint is made by counsel for the utilities in argument upon the exceptions to the rulings of the master upon the exclusion of testimony offered, and the acceptance of testimony objected to during the hearings. This subject relates generally to the testimony of an engineer from Buffalo, in which it was sought to develop proof of material and labor costs through that witness. The witness was expressing himself in terms and figures applicable to those costs in Buffalo, and the master sustained objections to that line of proof. In this the master was correct, unless the costs in contemplation were translated into terms of cost applying to Columbus and vicinity. This process may or may not have been in the minds of counsel at the time. However, under the view taken by the court, and under the methods used in the analyses and reasoning of this opinion, such proof, whatever may have been the ultimate theory of counsel, could only be considered corroborative

17 F.(2d)—41

and cumulative, and the ruling of the master did not tend to a prejudicial result in respect to the rights of the utilities.

[15] Complaint is also made to the refusal of counsel for the city to consent to what was termed an "engineering conference." It was said that such a conference was first agreed upon, and later repudiated by the city. The record scarcely bears out this contention, but, even if true, it could in no way affect the ultimate issues in the case. The burden of the issue was upon the complainant, and however practical or helpful such a conference might have been in eliminating disputes and controversies, and for bringing the parties to a common understanding, the city was within its rights when it declined the conference and insisted upon the proofs from the opposing parties.

Heretofore, on the 11th day of June, 1925, upon the application of the complainant company and the defendant the Federal Gas & Fuel Company, and upon the evidence adduced at that time, interlocutory injunctions were issued out of this court, among other things fixing a so-called temporary rate to be paid said companies for natural gas, and absolving said companies from the duty of extending their services and facilities to new or additional territory, or to new or additional customers, during the pendency of the action, and until final decree therein. This opinion sustains the conclusion of the master upon the paramount issue, to wit: The constitutionality of the ordinance of the city of Columbus.

[16] There is a well-marked distinction between a return nonconfiscatory in character, and one which is fair in a commercial and economical sense. A rate of return may be all sufficient in fulfilling the demands of the Fourteenth Amendment to the Constitution of the United States, and at the same time fail in amount to encourage and justify the operation of a utility business under that degree of maximum efficient service to which the public is entitled. The former is a purely judicial question, while the latter is essentially legislative. Detroit & M.-R. Co. v. Michigan R. R. Commission (D. C.) 203 F. 864, 870; Monroe Gaslight & Fuel Co. v. Michigan P. U. C. (D. C.) 292 F. 139, 150; Banton v. Belt Line Ry. Corp., 268 U. S. 413, 422, 45 S. Ct. 534, 69 L. Ed. 1020.

The allowance of the interlocutory injunction, under the proof before the court at the time of allowance in the establishment of a temporary rate, must be examined at

this time in the light of the proof contained in the entire record, and in view of the resultant findings of the court in this opinion. Such an examination will both justify and impel a modification of the former orders of the court, and the interlocutory injunctions heretofore allowed and in force until this time, will be modified and superseded as follows:

Until the further order of this court, or the further order of an appellate court to which this case may be taken, a temporary continuing rate to be paid by the customers of said companies in the city of Columbus shall be a minimum charge of 75 cents net per month to each customer, and a flat rate of 48 cents net per 1,000 cubic feet used in any one month, and the difference between the rate herein fixed and the rate heretofore as on the date stated by such prior injunctive order fixed, shall by the respective companies be returned in cash, within a period of 30 days from the 1st day of February, 1927, to the customers of said companies having paid said former rates. And the former orders heretofore made are modified by canceling the order absolving said companies from extending their services and facilities to new or additional territory or to new or additional customers. Such further changes or modifications in the former orders of injunction as may seem to either party to be right and proper may be brought to the attention of the court by an application therefor.

The issues raised by the cross-bill of the defendant city of Columbus, Ohio, and the answers thereto of the Columbus Gas & Fuel Company, the Federal Gas & Fuel Company, the Ohio Fuel Gas Company, and the Ohio Fuel Supply Company, have not been tried to the court, and the proof thereunder has not been submitted to the court, and it is not considered necessary to hear the same at this time. Jurisdiction to so try and determine such issues, together with jurisdiction to grant injunctive relief, is reserved and retained by the court until further order.

The cost of this proceeding, including an allowance of compensation to Hon. Oscar W. Newman, special master in the case, in the sum of $20,000, less advancements, and to Mrs. Florence K. Snively, the court reporter, in the sum of $5,217, less advancements, shall be taxed, assessed, and paid as follows: The Columbus Gas & Fuel Company, five-twelfths thereof; the city of Columbus, Ohio, five-twelfths thereof; and the Federal Gas & Fuel Company, one-sixth thereof.